WALSH, Appellant v. SHOULDERS et al., Respondents

(206 N.W.2d 60)

(File No. 11092. Opinion filed April 5, 1973)

Hobart H. Gates, Custer City, Allen G. Wilson, Hot Springs, for plaintiff and appellant.

Robert W. Gunderson of Gunderson, Farrar, Aldrich, Warder & DeMersseman, Rapid City, for respondents, Eugene A. Erickson, Ellva M. Erickson and Southern Hills Bank, a corporation.

BIEGELMEIER, Chief Justice.

On the afternoon or evening of January 14, 1969, Helen Walsh, a spinster over 75 years of age who lived alone, was the owner of more than 200 acres of land (on which she had lived for most of her lifetime) worth over $50,000 and personal property worth $8,000, all free of debt or encumbrances. The next morning, if defendant Shoulders (whom she had known a relatively short time) and Banker Erickson (whom she had never seen before that date) are to prevail in this action, the real estate was gone (deeded to Shoulders and his wife), the personal property mortgaged to a bank for a loan of $3,000 paid to her in 150 twenty dollar bills which disappeared and she was without a home or funds to support her declining years.

As Shoulders then owed the bank about $23,000, which was due the previous November, three days later the bank took a mortgage for $38,000 on 160 acres of Helen's former land, and the same day the banker and his wife had a mortgage, which was soon thereafter followed by a deed to them, from Shoulders and his wife on the rest of Helen's former land.

Those are the bare, undisputed outlines of this action. While some further evidence will be adverted to, it will only paint the picture in greater detail—not change it. For easy identification, the opinion will at times refer to plaintiff as Helen, defendant Marvin Shoulders as Shoulders, and defendant Erickson and his Southern Hills Bank as Banker and Bank respectively.

The trial court held the deed from Helen to Shoulders and his wife was voidable, and, so far as they were concerned, it was rescinded and the title to the 160 acres was vested in Helen, subject to the $38,000 mortgage. It also held the banker and his wife were owners in fee of the 50-acre tract. We affirm in part and reverse in part the judgment and remand it as hereafter indicated.

The 160-acre tract was homesteaded by Helen's father, and Helen became the owner in 1930; she homesteaded the 50-acre tract, receiving a patent for it in 1919. It was four miles from Custer, South Dakota, where she lived alone and engaged in a modest way in raising and grazing cattle.

Shoulders operated a Rodeo Shop in Custer with cattle, saddle horses, saddles and equipment incidental to keeping a stable. Helen knew of Shoulders in the store in Custer, but had no dealings with him until the latter part of 1968 when, according to his testimony, he fed the cattle, fixed fences, etc. voluntarily without Helen asking him to do it in November of that year. In December 1968 and at some times thereafter to early 1969, again without any request from Helen, Shoulders cut wood, took her to doctors, took her groceries and brought feed for her animals. He later testified he had borrowed $650 from Helen in November 1968, had never repaid her in cash, but by buying feed, "feeding the cattle and whatnot."

During the two months immediately involved, Helen became ill and spent much of December 1968 in a Custer hospital where Shoulders brought her a Christmas bouquet and another present. At that time Shoulders' wife was also in the same hospital, across the hall from Helen. On Helen's release in early January 1969 she went to Shoulders' home about a mile and a half from Custer. Shoulders told Helen the finance company had taken their car and she was asked to mortgage her cattle to the Southern Hills Bank, obtain a loan and give him the money.

On January 10, 1969, Shoulders took Helen to the Southern Hills Bank in Edgemont. He testified[1] the purpose of the trip was

---

1. In May 1970, when Shoulders testified by deposition, he was living in Phoenix, Arizona.

for Helen to make a loan. Why Helen, who lived four miles from Custer and had done business with a bank there for at least 24 years, would be driven 40 miles away to Edgemont to make a loan from a bank she had never dealt with, whose officers she did not know and who did not know her has a bearing on what was soon to happen. Helen signed an application for a loan of $3,000 and changed her account from the Custer bank to the Edgemont bank. Defendant Erickson was not then at the bank.

On January 14, 1969, defendant Erickson, the President and part, if not the substantial, owner of the Edgemont bank, came to Shoulders' home where Helen saw him for the first time. There is inexactness and some difference of testimony as to the exact hours Erickson was there, but it is undisputed he made two trips—one in the afternoon and one in the evening. Some of the testimony is that on the first trip (in the afternoon) he checked the cattle to be included in the mortgage and after Helen signed the $3,000 note and mortgage and asked for cash he drove back to Edgemont and returned in the evening with the $3,000 in twenty dollar bills, which he counted out on a table, and that night the contested deed was signed. Other testimony is that the deed was signed on the first trip at an earlier hour. However that may be, the banker's testimony was that after the note and security agreement, as they are now referred to, were signed Helen said she wanted the $3,000 in cash. He said he would bring it to her later. This was followed by a discussion about drawing a deed transferring all her land to Shoulders and his wife. After suggesting that Helen have a lawyer draw the deed, and her stating that she did not want that and he could do it, the banker agreed to do so and produced a deed from his briefcase, drew the deed and Helen signed it.

Both Shoulders and the banker testified they had warned Helen that the deed would make Marvin and Norma Shoulders owners of the property and that they would possibly have to mortgage it. Neither Shoulders nor the banker mentioned that Shoulders was in debt for $23,000 secured by a mortgage to the bank of which Erickson was president.

Helen testified the banker's second visit was at night, she had been in bed, was very ill with flu and she did not read the papers

she signed and did not understand the transaction. The banker admitted he did not read the deed to her and that he was there between 9 and 10 o'clock the night of January 14th when he left the $3,000[2] cash on the table.

The next day Shoulders asked a doctor if he would care for Helen at the hospital, and on January 16, 1969, Shoulders took her to the Hot Springs hospital where she was admitted.

Shoulders' testimony was that the cash transfer and signing of the deed occurred at night around 9 or 9:30, though Erickson said the deed was signed on his first visit that day and he brought the cash that night. Helen said Shoulders took the $3,000;[3] he said she put it in her purse. When she was admitted to the hospital on the 16th Helen's purse contained only one ten dollar bill and eight one dollar bills.

The Hot Springs hospital record prepared by her attending physician showed Helen was very confused, unable to tell her age within 10 years, and her illness from Christmas 1968 to date of admission was such that she was so acutely ill, weak and incapable of self-care that she was taken to Shoulders' home where she was cared for for a few days, but that Shoulders and his wife were incapable of giving further care and "shouldn't be required to administer care to this woman because they have no responsibility" for her.

After describing her illness, weakness and confusion, the attending physician testified that on January 16th Helen demonstrated signs of senile arteriosclerotic or chronic brain syndrome and her illness made her to a degree incapable of understanding many things; that it was difficult for her to understand anything involving a business transaction; that there was some mental impairment, and there was a reasonable doubt that she would be capable of anything very intricate a few days before the 16th.

---

2. The $3,000 has been paid and is not in issue in this litigation.

3. A note of Norma Shoulders of $2,986 to a Tulsa, Oklahoma bank, marked paid on January 21, 1969, secured by a lien on her automobile together with a release of the lien on it appear in the record.

Helen's testimony at the trial showed that this confusion or mental impairment existed to some degree.

When Helen was discharged on January 21st, it was her doctor's plan that she go to a nursing home or rest home for the balance of the winter, but she only stayed there about two weeks.

Both Shoulders and banker Erickson told of the conversations that accompanied the deed transaction. The banker testified he told Helen that he would "hold it a few days, and if she had a change of mind, she knew my name was in the phone book and the bank number is in the phone book." As to this Shoulders testified: "Mr. Erickson * * * told her * * * he was going to hold it for a week or so for her to make up her mind".

Shoulders testified:

"A * * * she wanted us to have the property. We had been nice. She was staying at our place. We had done everything we could to help her * * * she was told repeatedly that she would be living here for the rest of her life. * * * our agreement was—yet it wasn't an agreement—it was just understood—we were going to continue to take care of her and look after her (another reference to this agreement as to Erickson appears later). * * *

Q Did you give Helen A. Walsh any actual money for the transfer of the title to her property?

A I did not. My wife did.

Q What amount did your wife give to her?

A Two $5.00 bills."[4]

---

4. If this was a crude attempt to make the transaction either a gift or sale it was no bona fide sale. See Cramer v. Cramer, 81 S.D. 94, 131 N.W.2d 102 at 103.

On this subject a feed dealer testified he told Shoulders: " 'I heard you bought Helen's place' " and Shoulders answered: " 'Yes, I suppose I'll have to take care of her the rest of her life.' " Another witness, a Shoulders' ranch hand, testified that in February 1969 Shoulders told him he had just bought the place, that he was going to have Helen put in a nursing home as " '[t]hat old woman is crazy' " and " '[d]on't let that old woman out of your sight, I want to know every move she makes.' "

The deed in question was taken to Edgemont by Erickson. Helen had signed it in Custer County, yet as notary public Erickson certified she had acknowledged it before him on January 14, 1969, in Fall River County, wherein Edgemont is located.

The next day Shoulders was arranging with Dr. Roper to enter Helen in the hospital at Hot Springs, and he did take her there on the 16th where she remained until the 21st. Her condition at that time has been described. Shoulders and Erickson knew of the agreement whereby Helen had a few days or a week to change her mind about the deed, yet on January 17, 1969, Shoulders and his wife signed the 180-day redemption mortgage prepared by Erickson and acknowledged by him as notary public mortgaging the 160-acre tract to Erickson's bank for $38,000— $23,000 was the old debt and $15,000 was advanced according to Erickson's testimony. The $38,000 was due on demand. That same day, January 17, 1969, Shoulders and his wife executed a similar 180-day redemption mortgage on the 50-acre tract to Erickson and his wife to secure a note for $1,000 due on demand. Then by deed dated March 31, 1969, recorded April 7, 1969, Marvin and Norma Shoulders conveyed the 50-acre tract to Erickson and his wife as joint tenants. The Helen Walsh to Marvin and Norma Shoulders deed was recorded January 21, 1969, so both the mortgages—the one to the bank and the one to the Ericksons—were executed prior to the recording of the Helen Walsh deed and months before the time any abstract was prepared or furnished. The abstracts, new from the patents, were certified to on June 3, 1969.

The consideration for and the facts surrounding the two mortgages and subsequent deed are now mentioned. Erickson testified he advanced $1,000 to Shoulders when the mortgage was

signed on January 17, 1969, and that he had agreed to advance him up to $5,000 on the 50-acre tract, but had refused to advance him more than that so Erickson purchased it for the agreed sum of $10,000. However, he testified he only paid Shoulders "$6,500.00, and the balance of the $10,000.00 will be given when Miss Walsh no longer needs the property." Thus, both Erickson and Shoulders agree that this deed transaction was subject to and included some agreements not in the deed itself—as Shoulders testified:

"A * * * the balance [of the $10,000] would be paid— well, say, when Helen A. Walsh passed away because it was in the agreement from him that she would continue to live there the rest of her life. This was a stipulation between Mr. Erickson.

Q Was this agreement ever reduced to writing?

A I believe we did have something written down. I don't know. Maybe we just made notes or sketches of it but—

Q Do you have a copy of that writing?

A I don't believe that I do. I don't know. * * *"

There is a serious question whether as a matter of law there was a valid delivery of the Helen Walsh to Marvin and Norma Shoulders deed; we prefer to base our decision on another ground, though the delivery problem has some bearing on it.

The trial court found that the deed from Helen to Shoulders and his wife was a voidable deed and by Helen's act of rescission the force and effect of the deed (so far as the Shoulderses were concerned) was rescinded and title to the 160 acres was vested in Helen—such vesting to be subject, however, to Shoulders' $38,000 mortgage to the bank; it found Erickson and his wife were the owners of the 50-acre tract.

While in Davies v. Toms, 75 S.D. 273, 63 N.W.2d 406, the trial court found undue influence was exerted in procuring

the execution of the deed,[5] the opinion reflects this court's views on that subject. The recognized elements of undue influence were said to be: a person subject to influence; an opportunity and a disposition to exert undue influence; and a result indicating exertion of undue influence. All of these were present in the case at bar. Helen was of an advanced age, she had been self-sufficient when in good health, but now she found herself alone and so sick that she was unable to care for herself or her livestock in the winter. Hospitalized and ill, of necessity, she turned to this neighbor, Shoulders, who she believed would help her. He testified at first that he was doing favors for her voluntarily, but later, when it was disclosed that Helen had loaned him money recently, he testified he was paying her back by helping her. These acts of kindness—driving her to a doctor and the hospital and giving her flowers and presents—during a time when unknown to her Shoulders was heavily in debt to the bank and others, all reveal his motives. The bank mortgage had been due in November at which time it was made a demand obligation.

The hospitals and Shoulders' home were Helen's shelters, and in her condition she was easy prey. From his own admissions, Shoulders was to care for her as long as she lived, yet nothing in writing evidences that, and he never expected to carry out the agreement. Under the admitted testimony of both Shoulders and Erickson, on the third day after the deed was dated and while Helen could still recall it, the 160-acre tract was mortgaged by Shoulders to the bank and the 50-acre tract was mortgaged to the banker and later deeded to him and his wife. Shoulders' story that Helen wanted to help him by giving him the property rings false as to both him and Erickson. Shoulders knew and so did the banker that it was but a short time until the property would be included in the mortgage. Erickson saw the chance to convert a recently due and then extended loan on chattels to a more solid loan on real estate worth double the indebtedness.

---

5. Under some similar circumstances: grantor very ill; doctor's testimony that she would not understand much of anything; acts of kindness by and intimacy and dependence on grantee; a Sunday deed predated to Saturday, while here the scrivener notary's certificate stated it was acknowledged in a county other than the proper county.

■ In re Daly's Estate, 59 S.D. 403, 240 N.W. 342, involved a will in which the testator gave most of her estate to the lawyer who drew the will in trust for his son. The court said in view of the confidential relationship that existed:

"He should have observed the rule of law applicable to his position, and which is best stated as follows: 'One of the most important requisites of the validity of these transactions between persons acting under the influence of these confidential relations is, that the party presumably under the influence of the other should have had independent advice from a lawyer, who is devoted entirely to the interest of the party he is called upon to advise, and in whom that party had entire confidence.' Jones' Commentaries on Evidence, vol. 2; § 190."

Following this reasoning and consistent with it, Davies v. Toms, supra, announced the theory of law that the cloud of undue influence is removed on a showing that the grantor had independent advice that is neither incompetent nor perfunctory.

In re Metz' Estate, 78 S.D. 212, 100 N.W.2d 393, involved undue influence as to a will. The court wrote:

"There is no direct proof of undue influence in this case. There seldom is. Undue influence is not usually exercised in the open. 'It is therefore usually solely through inferences drawn from surrounding facts and circumstances that a court arrives at the conclusion that a will is the product of undue influence * * *'.

"* * * a presumption of undue influence * * * arises where a confidential relationship exists between the testator and a beneficiary who actively participates in the preparation and execution of a will and unduly profits therein. Annotation 154 A.L.R. 583. Where these facts exist the transaction should be 'scrutinized closely and condemned unless shown to be fair and above board.' "

The court also referred to the necessity of advice with the following words:

> "During this period decedent was either at Imel's home or hospitals at Rapid City. Metz was in strange surroundings away from his usual friends and neighbors. Imel was kind to him and took care of his every need. In the preparation and execution of various legal documents Metz never had the benefit of independent legal advice or counsel."

Without citing these cases, the court in Orr v. Allen, 73 S.D. 547, 45 N.W.2d 737, was confronted with and approved the same independent advice theory in an action brought for rescission of a contract for deed. Orr, a 70-year-old man of low mentality, sold by contract for deed property for substantially less than its value. While his lack of mentality to make the contract was claimed, the trial court found (and the Supreme Court approved this finding) that he was not a person entirely without understanding; the trial court also found actual "fraud had not been established" though the "rescission here sought is based upon alleged fraud". The trial court therefore refused to enter a judgment that "the contract be cancelled or rescission be granted" and dismissed plaintiff's complaint. Evidently Orr was not bright with reference to money and its relation to the value of property, but he was not entirely without understanding and so was able to contract under the standard set forth in SDC 30.0801.

Without relying on undue influence by a person in a confidential relationship as to a sale of property sold for less than its value, the court in Orr v. Allen wrote:

> "After reading the entire transcript of Orr's testimony we can come to no conclusion other than that his mentality was such that in a transaction of the character of the one here involved he should have had protection and advice. Instead of advice and protection, the transaction, as found by the trial court, was handled with undue haste * * * We are convinced that the undisputed facts in this case establish a constructive fraud. In-

adequacy of consideration alone is not sufficient. But it appearing as the result of evidence that there is a degree of mental weakness on the part of the vendor, not indeed so great as to vitiate every instrument which he might execute, but such as to make it eminently necessary that he should have protection and advice; that fact coupled with the circumstance that the property is sold at an inadequate price is sufficient, in our opinion, to constitute a constructive fraud. * * * We are of the view that rescission should have been decreed."

See also reference to Orr v. Allen in Cramer v. Cramer, 81 S.D. 94, 131 N.W.2d 102 at 104.

■ Though there are always some differences in the facts in every case, the thread runs clearly in the cases cited that under some given circumstance independent advice is necessary to sustain a valid conveyance and the facts here shown are an example of the soundness of our decisions in that respect. We are aware of this court's review of findings of the trial court on appeal and that the credibility of witnesses and weight of evidence is for the trial court. Nicolaus v. Deming, 81 S.D. 626, 139 N.W.2d 875. However, Marvin Shoulders, one of the defendants and an important witness in this action, did not testify at the trial in person. His testimony was taken prior to the trial by deposition before a notary public and it was introduced in evidence by defendants, Marvin and Norma Shoulders, Eugene and Ellva Erickson and the bank. When testimony on an issue is presented without an appearance before the trial court of the witness who gave such testimony we review that evidence unhampered by the rule that a trial judge who has observed the demeanor of the witness is in a better position to intelligently weigh the evidence than the appellate court. State Automobile Casualty Underwriters v. Ruotsalainen, 81 S.D. 472, 478, 136 N.W.2d 884, 888. The evidence, part of which has been stated, indicates the facts decisive of the issue are undisputed and the testimony of an important witness being in the form of a deposition, it, of necessity, must be given the credit or lack of it as the other facts disclosed or were not shown by other evidence. It is in applying the law to the facts that the trial court erred in arriving at the conclusions of law and the judgment that was entered.

Evidence was introduced by plaintiff and defendants as to the execution of three instruments early in March 1969 when Helen visited an attorney's office in Hot Springs. The attorney testified she asked him to prepare a will and an appointment of a guardian, to this was added a power of attorney. All the papers were signed by Helen. In summary the power of attorney turned over Helen's affairs to run her business as a rancher (though little was left), even incur debts and execute notes, it seems without limit. The grantee of the power of attorney was Marvin Shoulders; one of the witnesses was a bank officer of defendant bank.

The will gave the property to Shoulders and his wife, and in the event of their deaths to their son. While the will declared testator had a joint checking account with Eugene A. Erickson in the bank of which he was president, it then attempted a disposition of it, named him executor (and Shoulders as such if Erickson declined to act) without bond and authorized a sale of her property without court order. It gave an item of personal property to Erickson and (unnecessarily SDCL 29-6-8) to Shoulders in the event Erickson predeceased him. Erickson and the same bank officer were two of the witnesses to the will.

The appointment of a guardian stated the guardian was to serve as such during the time Helen was incompetent, without bond, and authorized him to convey all her property at public or private sale without court order, notice or confirmation, and if for any reason the guardian named, Marvin Shoulders, refused to act it nominated Eugene A. Erickson as guardian. All three of these papers were signed March 10, 1969, with Shoulders, Erickson and a bank officer present as witnesses. Helen was brought to the lawyer's office by Shoulders who paid the lawyer's fees for this service.

This evidence does not lessen support of the plaintiff's claim, rather it shows the continuance of the undue influence of Shoulders and the extent to which he and the other interested defendants assured their complete dominance over Helen. In Davies v. Toms, supra, the attorney was employed by the grantor to prepare the deed of conveyance, yet the court wrote:

"The attorney's testimony however clearly discloses that he was called not as a counselor but as a draftsman. Grantor did not seek his advice on a matter of disposition of property she then was considering. Her mind was made up. Her positive assurance to the lawyer, on his inquiry, that she knew what she wanted to do, and furthermore had the right to do it, is entirely consistent with, and conceivably supports the contention, that the grantor's attitude of mind was due to the coercion of appellants. The theory of law that removes the cloud of undue influence on a showing that the one allegedly overpersuaded had independent advice involves of course actual advice that is neither incompetent nor perfunctory."

If the deed was valid Helen had conveyed all the land she owned—the ranch—to Shoulders and his wife, so the power of attorney authorizing Marvin Shoulders to manage her "business as rancher" was an admission by him that Helen owned a ranch, and if she understood it, it was an assurance to her that she still owned it. There was no evidence that she ever stated she had given the land away or believed she had done so prior to the bringing of the action; yet Shoulders wanted this authority and Erickson witnessed it. In the event Helen became incompetent Shoulders was appointed guardian, and if he did not act for any reason Erickson was designated guardian, so they provided for that contingency. If Helen died the will gave the property to Shoulders and his family, except one item to Erickson, so no relative or heir could have an interest or reason to object to the deed. It may be apt to quote from In re Metz' Estate, supra, where, as to a similar combination of papers, the court wrote:

"Imel's disposition to unduly influence Metz for an improper purpose is clearly established. It is evident from Imel's persistent efforts to gain control and possession of testator's property—by guardianship proceedings, power of attorney, gift, and finally by will."

These instruments did more to protect the interested defendants as to their claims of title than served any purpose of Helen.

Her financial statement, excluding the ranch, listed about $8,000 of personal property. After paying off the $3,000 cash loan and the hospital and doctor bills she had very little to give away or manage. The attorney who prepared the instruments was relatively inexperienced, having been in the practice just over two years and, as in Davies v. Toms, his advice was not sought by plaintiff as to a matter of disposition of her property nor does it appear he knew of the earlier transactions. He had never seen Helen before and his fee was paid by Shoulders who took her to his office and paid the bill. This indicates he regarded, at least in part, that Shoulders was the client or was managing her affairs.

■ In accord with the words of this court in Orr v. Allen, supra, after reading the entire transcript and record, we conclude the deed from Helen to Shoulders and his wife must be cancelled and set aside. The trial court could not have found and held the Helen Walsh to Marvin and Norma Shoulders deed voidable, which it did, unless there was fraud or undue influence used in obtaining it. We conclude the trial court was correct in holding the deed voidable and in effect revesting title to the 160 acres in Helen, but it erred in subjecting this tract to the bank mortgage; it further erred in holding the Ericksons were owners of the 50-acre tract.

■ Erickson, for himself and also as President of the bank, stands in the same shoes as defendant Shoulders. He had knowledge of and actively participated in the preparation and execution of the deed and unduly profited therein. In re Metz' Estate, 100 N.W.2d at 398. He was present when the execution of the deed was discussed, he agreed to prepare, counseled in and directed its execution. He had never seen Helen before that day, but he knew she had been ill and hospitalized recently, that she was being cared for in Shoulders' home, and that she was giving away, without independent and disinterested advice, her ranch, leaving her without means to provide for her support. Independent advice was not only necessary—it was crucial. While Helen may have been confused about what she signed, there is no doubt that the deed was to be held for some time before it was recorded to Shoulders and his wife; this meant it was subject to recall, and competent, disinterested and independent advice would have

counseled her fully as to the consequences of her act. Independent advice would have placed a clause for retention of a life estate, if such was the agreement, and would have informed her as to the necessity of filing a gift tax return. Without making any inquiry of Helen or Shoulders as to Helen's decision about recalling the deed, which would have informed him of her return to the hospital within the holding period, Erickson obtained the $38,000 mortgage as additional security for the old $23,000 debt to the bank and his own mortgage and advanced $15,000 to Shoulders even before the deed was recorded. His actions were those of one who had an interest as great as Shoulders had in procuring the deed.

That part of the judgment appealed from which decreed the plaintiff Helen A. Walsh was the owner in fee simple of the 160-acre tract described in paragraph I is affirmed, but reversed insofar as it made that tract subject to the mortgage of the Southern Hills Bank; that part of the judgment which held Eugene A. Erickson and Ellva M. Erickson the owners in fee simple of the tract described in paragraph II is hereby reversed with directions to enter judgment cancelling the Helen A. Walsh to Marvin and Norma Shoulders deed and quieting title in her to all the land described in the complaint.

HANSON, WINANS and WOLLMAN, JJ., concur.

DOYLE, J., not participating.