#28884-a-SRJ
**2020 S.D. 17**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

In the Matter of the Estate of
DORA LEE GAASKJOLEN, Deceased.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
PERKINS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WARREN G. JOHNSON
Retired Judge

* * * *

JOHN STANTON DORSEY of
Whiting, Hagg, Hagg, Dorsey
   & Hagg, LLP
Rapid City, South Dakota            Attorneys for appellant
                                               Audrey Lorius.


MICHAEL M. HICKEY
SARAH BARON HOUY
KELSEY B. PARKER of
Bangs, McCullen, Butler
   Foye and Simmons, LLP
Rapid City, South Dakota            Attorneys for appellee
                                               Vicki Penfield.

* * * *

ARGUED
OCTOBER 1, 2019
OPINION FILED **04/01/20**

#28884

JENSEN, Justice

[¶1.]        In 1990, Dora Lee Gaaskjolen and her husband Marlin executed reciprocal wills giving their property to one another upon death. Their daughters, Audrey and Vicki, were named as equal, alternate beneficiaries. Marlin died in 2003. In 2012, Dora Lee executed a new will that disinherited Vicki and left her entire estate to Audrey. Dora Lee was 87 years of age at the time. Dora Lee executed another will shortly thereafter and a codicil to her will in 2014. The latter will and codicil also disinherited Vicki and left Dora Lee's property to Audrey. After Dora Lee's death in 2016, a petition was filed to probate Dora Lee's last will and codicil. Vicki challenged the will and codicil, claiming Dora Lee lacked testamentary capacity and that Audrey had unduly influenced their mother. Following a trial, the circuit court determined that Dora Lee had testamentary capacity but invalidated the will and codicil on the basis of undue influence. Audrey appeals the circuit court's decision. We affirm.

**Facts and Procedural History**

[¶2.]        Marlin and Dora Lee were successful ranchers in Meadow, South Dakota, owning approximately 3,000 acres of ranch and farmland. Throughout their lives, Marlin and Dora Lee made every effort to treat their daughters and grandchildren equally, as evidenced by the wills that they both executed in 1990. Dora Lee also made certain at Christmastime that each child's candy bag included the same kind and quantity of candy. Later, when one of the grandchildren defaulted on a $5,000 loan from Dora Lee, she gave a like sum to each of the other grandchildren.

-1-

[¶3.] In 1999, Audrey, a registered nurse, moved to the ranch to care for her parents. Vicki lived about 30 miles away from the family ranch. After Marlin's death, Audrey continued to live at the ranch and provided care for Dora Lee. Dora Lee had multiple health issues including a hip surgery, ulcers, skin cancer, and a mitral valve prolapse. In 2007, Dora Lee suffered a brain injury after a longhorn heifer kicked her. The brain injury forced her to spend several weeks in the hospital and undergo a lengthy rehabilitation. Dora Lee did not fully recover from the injury and suffered from facial aphasia, making it difficult for her to speak in more than one or two-word responses.

[¶4.] Vicki and Audrey both assisted their mother after the injury. Audrey provided full-time personal care while Vicki managed Dora Lee's finances. In exchange for providing full-time care, Audrey was given possession of the south half of the ranch property rent free, allowing Audrey to maintain her livestock on the property. Audrey also paid herself each month from Dora Lee's account. Audrey increased these payments over time. The benefits Audrey received for Dora Lee's care were later valued at $6,315 per month.

[¶5.] Starting in 2009, Dora Lee leased the north half of the property to Vicki for a reduced rate of rent. Vicki subleased the north half for more money than her rental obligation and deposited the excess funds into a special account for Dora Lee's future needs. Vicki often visited the ranch, but by 2012 she was no longer able to drive because of Parkinson's disease. As a result, Vicki was limited to visiting when someone was available to drive her to the ranch.

[¶6.]     In early 2012, Audrey told Vicki she wanted to take over the north half of the ranch because she needed more pasture for her cattle and horses. Vicki expressed concern because she planned to sublease the north half of the farm to her daughter and son-in-law. In August 2012, Audrey again brought up the lease issue to Vicki, claiming that Dora Lee wanted to lease the north half of the ranch to Audrey. Later that month when Vicki's husband visited the ranch, he became very upset after Dora Lee communicated to him that she wanted to lease the north half of the ranch to Audrey.

[¶7.]     After this encounter Audrey prepared a termination letter, purportedly signed by Dora Lee, which terminated Vicki's lease. Vicki then filed an emergency petition for appointment of a temporary conservator. The court appointed Dacotah Bank as temporary conservator. In pursuing the conservatorship, Vicki expressed concerns about Dora Lee's health, Audrey's unlimited authority to write checks on Dora Lee's account, and the adequacy of Audrey's care of Dora Lee.

[¶8.]     Audrey contacted and hired attorney John Nooney to represent Dora Lee in the guardianship action. From 2012 to 2014, Nooney and his associate, Marli Schippers, met with Dora Lee a total of four times. All other communications were with and through Audrey. Although Nooney's letters were addressed to Dora Lee, it was Audrey who opened the mail and communicated with Nooney. According to Audrey, Dora Lee was upset about the conservatorship, the lease dispute with Vicki, and the fact that Vicki did not visit her after the conservatorship was in place. However, evidence presented at trial showed that these were Audrey's personal feelings. Evidence was also presented that Audrey prevented Vicki from

coming to the ranch and communicating with Dora Lee after the conservatorship was filed.

[¶9.]     Audrey claimed that in the fall of 2012, Dora Lee told her she wanted to exclude Vicki from her will. She contacted attorney James Elsing on December 4, 2012, about a new will for Dora Lee. Audrey spoke with Elsing for more than an hour and expressed the reasons she disliked Vicki. She discussed with Elsing the lease issue on the north half of the property, the conservatorship, and the fact Vicki did not visit often enough. Audrey also told Elsing that Dora Lee wanted to leave everything to Audrey, to the exclusion of Vicki. Before speaking with Dora Lee, Elsing prepared a will leaving all the property to Audrey. He sent a draft for Audrey to review. Audrey made a few changes to the will and also asked if a clause could be put into the will that disinherited anyone attempting to contest the will.

[¶10.]     Two days later, Elsing traveled to Dora Lee's home with a draft of the will he had discussed with Audrey. Audrey arranged for two witnesses to be present. Elsing asked Audrey and the witnesses to step out of the room while he discussed the will with Dora Lee. Elsing believed from his meeting with Dora Lee that the will reflected Dora Lee's intentions. Dora Lee then executed the will. After the will was drafted, Elsing made additional estate planning suggestions to Audrey that could be implemented if the guardianship was not in place. Audrey responded, "You know things we can do to save mom's money and items from going to the wrong side that I have no clue about so if you are willing we sure could use you on our side."

[¶11.] A few days later, Schippers learned from Audrey how the new will had been made. She told Audrey there would be serious concerns about the validity of the new will. Nooney and Schippers then suggested that another will would need to be drafted. After Nooney was unable to locate an attorney in the Rapid City area willing to draft another will, Audrey contacted Elsing about drafting the will for Dora Lee. Audrey told Elsing that the lawyers in Rapid City advised her another will would need to be signed for it to "hold up" in court. Audrey also told Elsing that the lawyers suggested Elsing should meet independently with Dora Lee two or three times before she signed the second will.

[¶12.] Thereafter, Elsing met with Dora Lee on December 14 and 18, 2012 concerning a new will. At the first meeting, Dora Lee verbally responded to a list of 26 questions prepared by Elsing concerning her property, capacity, and testamentary intentions. At the second meeting, Dora Lee answered similar "yes and no" questions on a written document by underlining her answers and wrote her answers to other questions. Elsing testified that he also read through the will with Dora Lee and confirmed that it expressed her wishes. Dora Lee then executed the will on December 18, 2012. This second will was identical to the prior will signed on December 6, 2012. Elsing returned on January 7, 2013 to confirm the will reflected Dora Lee's intentions. These meetings occurred at the ranch when Audrey was out of the room. However, Audrey made the arrangements for the visits. Audrey also arranged for two witnesses to be available when the new will was executed.

[¶13.] After the will was executed, a registered nurse conducted a home study for the conservatorship. The nurse concluded that Dora Lee wanted to remain in

her home, and that Audrey was trying to provide appropriate care for her mother. However, she also expressed concerns that Audrey was isolating Dora Lee from Vicki and her family and suggested scheduling regular visits.

[¶14.] A hearing on the petition for a permanent conservator was held on February 20, 2013. Dora Lee testified at the hearing but was mostly unresponsive to questions. The court granted the petition and named Dacotah Bank as her conservator. The decision was appealed on Dora Lee's behalf to this Court.*

[¶15.] In May 2013, attorney Shelley Lovrien, on behalf of Dacotah Bank, visited Dora Lee. Dora Lee told Lovrien she did not remember signing anything to engage an attorney and did not know who her attorney was. She also stated that she knew there were changes made to her will but she did not know what they were. She also expressed that she thought her children and grandchildren were the beneficiaries of her will.

[¶16.] In 2014, Nooney suggested that Dora Lee make a codicil to her will to reaffirm her testamentary intentions and name an independent fiduciary to replace Audrey as personal representative for Dora Lee's estate. He believed that this might further negate a claim of undue influence arising from the will. Elsing met with Dora Lee regarding the codicil Nooney suggested. On October 24, 2014, Dora Lee signed a codicil reaffirming her December 18, 2012 will. The only change the codicil made to the will substituted U.S. Bank for Audrey as Dora Lee's personal representative. Although the Dacotah Bank attorneys and trust officers were

---

\* *In re Conservatorship of Gaaskjolen*, 2014 S.D. 10, ¶ 20, 844 N.W.2d 99, 103. (Affirming that the appointment of Dacotah Bank as permanent conservator was in the best interest of Dora Lee.)

present when Dora Lee executed the codicil, Nooney forbade them from meeting with Dora Lee unless he or his associate were present.

[¶17.] Dora Lee died on March 29, 2016. After a probate of Dora Lee's estate was opened, Vicki challenged the validity of both the will and codicil. Following a five-day trial on Vicki's petition, the court entered a memorandum decision, and findings of fact and conclusions of law invalidating the will and codicil. The circuit court found that Dora Lee had testamentary capacity to make a will but concluded both the will and codicil were subject to undue influence by Audrey. The court found a presumption of undue influence existed and that Audrey failed to rebut the presumption. The court further found that Vicki established that Dora Lee's last will and codicil were the result of undue influence by Audrey.

## Standard of Review

[¶18.] [T]he issue of whether undue influence exists is a question of fact for the trial court to determine . . . . We will not set aside a trial court's findings of fact unless they are clearly erroneous. A trial court's finding is clearly erroneous if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made. All conflicts in the evidence must be resolved in favor of the trial court's determinations. The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the circuit court and we give due regard to the circuit court's opportunity to observe the witnesses and the evidence.

*In re Estate of Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d 277, 284.

## Analysis & Decision

[¶19.] Audrey claims the circuit court erred in concluding that a presumption of undue influence arose and that she had failed to rebut the presumption. She also claims the court erred in determining Dora Lee's last will and codicil were the result

of her undue influence. Vicki responds that the court correctly determined that Audrey failed to rebut the presumption of undue influence, but claims that even if Audrey rebutted the presumption, Vicki satisfied her burden of establishing undue influence.

1. *Whether the circuit court erred in finding a presumption of undue influence and that Audrey failed to rebut the presumption.*

[¶20.] "A presumption of undue influence arises when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the will and unduly profits therefrom." *Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289 (quoting *In re Estate of Dokken*, 2000 S.D. 9, ¶ 28, 604 N.W.2d 487, 495). This presumption shifts the burden "to the beneficiary to show he took no unfair advantage of the decedent. However, the ultimate burden remains on the contestant to prove the elements of undue influence by a preponderance of the evidence." *Id.* (emphasis omitted) (quoting *Dokken*, 2000 S.D. 9, ¶ 28, 604 N.W.2d at 495).

[¶21.] The beneficiary's burden arising from the presumption is referred to as "the burden of going forward with the evidence." *Id.* at ¶ 40 (emphasis omitted). This burden differs from the ultimate burden of persuasion. The burden to rebut a presumption "disappears when evidence is introduced from which facts may be found." *Id.* (quoting *McKiver v. Theo. Hamm Brewing Co.*, 67 S.D. 613, 297 N.W. 445, 447 (1941)).

> A presumption is not evidence of anything, and only relates to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. A presumption will serve as and in the place of evidence in favor of one party or the other until prima facie evidence has been adduced by the opposite party; but the presumption should never be placed in the scale

> to be weighed as evidence. The presumption, when the opposite party has produced prima facie evidence, has spent its force and served its purpose, and the party then, in whose favor the presumption operated, must meet his opponent's prima facie evidence with evidence, and not presumptions.

*Id.* (quoting *Peters v. Lohr*, 24 S.D. 605, 124 N.W. 853, 855 (1910)).

[¶22.]     Here, there is ample evidence that a confidential relationship existed between Audrey and Dora Lee and that Audrey actively participated in making a will and codicil that benefitted Audrey. The circuit court found a confidential relationship existed between Audrey and Dora Lee from at least 2007 until Dora Lee's death in 2016. During this time, Audrey was the only other person living with Dora Lee and, because of her physical limitations, Dora Lee depended on Audrey for nearly everything. Moreover, Audrey controlled who had access to visit and communicate with Dora Lee. Audrey also contacted the attorneys and expressed to them that Dora Lee wanted to disinherit Vicki and leave everything to Audrey. The circuit court found that "[a]lthough Audrey was not physically in the room when the wills and codicil were executed, she was instrumental in dealing with the attorneys and suggesting changes to the proposed will. She also arranged for the presence of witnesses on each occasion."

[¶23.]     Because a presumption of undue influence arose on these facts, Audrey had the burden to produce evidence that she "took no unfair advantage of the decedent." *Dokken*, 2000 S.D. 9, ¶ 28, 604 N.W.2d at 495. Our evidentiary rule for presumptions in civil cases requires more than "[m]ere assertions, implausible contentions, and frivolous avowals . . . to defeat a presumption." *Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 21, 790 N.W.2d 52, 60-61 (quoting *In re Estate of*

*Dimond*, 2008 S.D. 131, ¶ 9, 759 N.W.2d 534, 538. "When substantial, credible evidence has been introduced to rebut the presumption, it shall disappear from the action or proceeding, and the jury shall not be instructed thereon." SDCL 19-19-301. We have stated that "'substantial, credible evidence' should not ordinarily be equated with meeting any particular burden of proof." *Dimond*, 2008 S.D. 131, ¶ 9, 759 N.W.2d at 537. Rather, "the substantial, credible evidence requirement means that a presumption may be rebutted or met with such evidence as a trier of fact would find sufficient to base a decision on the issue, if no contrary evidence was submitted." *Id.*

[¶24.]       In *Pringle*, the circuit court determined a presumption of undue influence arose, but the beneficiary presented evidence to rebut the presumption. 2008 S.D. 38, ¶ 43, 751 N.W.2d at 291. This evidence included the fact that the beneficiary never prevented anyone from communicating or visiting the decedent, the new will was not inconsistent with the decedent's general wishes, and the decedent had independent legal advice when contemplating her last will. *Id.*

[¶25.]       In considering the presumption that arose in this case, the circuit court contrasted the facts from *Pringle* and noted that Audrey was in total control of who visited and communicated with Dora Lee. The court also highlighted evidence that Audrey expressed ill will toward Vicki and her family, advised Vicki that she was not welcome at the family ranch, and prevented Vicki from visiting and communicating with Dora Lee. The circuit court also noted that Audrey was actively involved in communicating with all the attorneys representing Dora Lee in

the conservatorship and estate planning. Based on these facts, the circuit court determined Audrey failed to rebut the presumption of undue influence.

[¶26.] However, there was other evidence presented by Audrey that the circuit court did not address in considering the presumption. Dora Lee's housekeeper testified that Dora Lee expressed frustration to her about the conservatorship and that Vicki's actions hurt her. Dora Lee also told the conservator that she wanted to disinherit Vicki because she was upset about the conservatorship. Dora Lee's attorneys testified that Dora Lee expressed a desire to exclude Vicki from her estate plan. Elsing also testified about the multiple meetings and written questions he posed to Dora Lee to ensure that she wanted to disinherit Vicki. Attorneys Nooney, Schippers, and Elsing each testified that their client was Dora Lee, not Audrey. Based upon their interactions with Dora Lee, the attorneys testified that they did everything they could to ensure the will and codicil reflected what they believed to be Dora Lee's testamentary intentions.

[¶27.] This evidence rebutted the presumption of undue influence, as a trier of fact could have found this evidence sufficient without considering contrary evidence to show Audrey did not take unfair advantage of Dora Lee. As we have previously stated, "the presumption of undue influence can be rebutted 'by showing that the one allegedly overpersuaded had independent advice that was neither incompetent nor perfunctory.'" *Pringle*, 2008 S.D. 38, ¶ 43, 751 N.W.2d at 290 (quoting *Black v. Gardner*, 320 N.W.2d 153, 159 (S.D. 1982). Because Audrey presented sufficient evidence to rebut the presumption of undue influence, we must determine whether the circuit court properly determined that Vicki met her burden

of persuasion by proving undue influence with respect to Dora Lee's last will and codicil.

>    *2.      Whether the circuit court erred in finding the last will and the codicil invalid because of Audrey's undue influence.*

[¶28.]      The contestant of a testamentary document has the burden of "prov[ing] each of the four elements of undue influence by the greater weight of the evidence." *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291. These four elements are: "(1) decedent's susceptibility to undue influence; (2) opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and (4) a result showing the effects of such influence." *Id.*

[¶29.]      The circuit court determined that Dora Lee had testamentary capacity when she signed her last will and codicil. However, this does not mean she was immune from undue influence. *In re Estate of Borsch*, 353 N.W.2d 346, 349 (S.D. 1984). "Susceptibility to influence does not mean mental or testamentary incapacity. In fact, the application of undue influence presupposes mental competency." *Id.* (quoting *In re Estate of Metz*, 78 S.D. 212, 221, 100 N.W.2d 393, 398 (1960)). When considering whether an individual is susceptible to undue influence, "evidence of physical and mental weakness is always material . . . ." *Borsch*, 353 N.W.2d at 350. "Obviously, an aged and infirm person with impaired mental faculties would be more susceptible to influence than a mentally alert younger person in good health." *Id.* (quoting *Metz*, 78 S.D. at 221, 100 N.W.2d at 398).

[¶30.]      Here, there is little question from the evidence that Dora Lee was susceptible to undue influence. *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291.

Dora Lee was 87 years old when she executed the will and 89 when she executed the codicil. She suffered from multiple medical problems that made it impossible for her to care for herself, including severe dementia, rheumatoid arthritis, chronic atrial fibrillation, valvular heart disease, expressive aphasia, and a traumatic brain injury. During the last ten years of her life, Dora Lee relied on Audrey's full-time care to remain in her home. Moreover, the court found that Dora Lee "could not make phone calls, retrieve her own mail, use a computer, make a meal, or drive a car."

[¶31.] There was also medical evidence to support the circuit court's findings that Dora Lee was susceptible to undue influence. Several doctors conducted medical evaluations and interviews with Dora Lee in 2012. One doctor stated, "She suffers from moderate to severe memory, orientation, problem solving, and information processing deficits which are further complicated by her expressive aphasia . . . ." A Licensed Clinical Neuropsychologist concluded,

> Secondary to her dense verbal aphasia, she sometimes responded with nonwords or with word substitutions, making it unclear as to whether she actually knew the answer to the question or not . . . . This woman appears to be very impaired from a neuropsychological perspective . . . . It is also very difficult to determine what she knows and does not know because of the word substitutions that occur.

[¶32.] There was also evidence to support the circuit court's findings that Audrey had the opportunity to exert influence over Dora Lee. Audrey lived on the family ranch with her mother from 2007 until Dora Lee's passing in 2016 and was her sole caregiver. Dora Lee relied on Audrey for nearly everything, including: bathing, dressing, brushing her teeth, toileting, moving to and from her wheelchair, transportation, meal preparation, shopping, and medication management. Audrey

also controlled who could communicate with and visit Dora Lee. The circuit court found this enabled Audrey to essentially isolate Dora Lee from having any contact with other family members, including Vicki.

[¶33.] The third element of undue influence is a disposition to unduly influence for an improper purpose. *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291. This is "evident from persistent efforts to gain control and possession of testator's property." *Borsch*, 353 N.W.2d at 350 (quoting *Metz*, 78 S.D. at 222-23, 100 N.W.2d at 398). The circuit court found that Audrey was predisposed to exert undue influence over Dora Lee, and the record supports that finding. Audrey played a major role in terminating Vicki's lease of the north half of the family ranch that Dora Lee had previously leased to Vicki for several years. It was not until after Vicki refused to allow Audrey to lease the land that Audrey drafted and had Dora Lee sign the termination of the lease between Dora Lee and Vicki.

[¶34.] Audrey's disposition to influence Dora Lee was also apparent in her feelings towards Vicki and her desire that Vicki not receive anything from Dora Lee. Audrey's emails and communications with Vicki and others show that she disliked and was angry at her sister. After the conservatorship was filed, Audrey told Nooney, "The fear I have is that they will get total control of mom's money, land, etc. shove her in a nursing home and I will have to leave the ranch that I have sweated, busted my ass over and loved all my life. I want to be buried on this place."

[¶35.] On September 17, 2012, Audrey sent Vicki a lengthy email stating

> And you call yourself a Christian? You are no more a Christian
> than someone who robs or murders their loved ones. I hope God

> will forgive you for what you have done to mom as I know I never will. . . . You people remind me of a vulture picking on the bones of an animal before it's dead . . . . [T]he devil has invaded your hearts and minds . . . . As far as I am concerned I have no flesh and blood sister, after what you have done to your own mother. I'm done with you as family. . . . How you could do this is beyond me and I don't know how any of you can sleep at night. Live with yourselves you three knowing what you have done to mom and May God Have Mercy On Your Black, Cold Souls when it comes time to enter the pearly gates.

[¶36.]    Finally, Audrey's active efforts in arranging for Dora Lee to draft a new will that benefitted her, as well as her statements to the attorneys, reflect Audrey's motivations. Audrey had many of the communications with Dora Lee's attorneys until Dora Lee passed away and was often present when Dora Lee communicated with the attorneys. Throughout this time, Audrey continually interposed herself into the process of Dora Lee's estate planning.

[¶37.]    The fourth and final element of undue influence is "a result clearly showing the effects of such influence." *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291. The will and codicil completely disinherited Vicki and left Dora Lee's entire estate to Audrey. This change increased the value of Audrey's inheritance by approximately 1.5 million dollars. The circuit court found that this "disposition is totally contrary to the way Dora Lee had lived and treated her daughters and grandchildren." This finding is supported by evidence of Dora Lee's desire to treat her children and grandchildren equally, as well as the original wills signed by Marlin and Dora Lee that equally divided their estate between Audrey and Vicki. Even after Marlin's death, Dora Lee did not change her will until after the dispute arose between Audrey and Vicki over the north half of the ranch. There was also evidence that Dora Lee and Vicki had a good relationship, and it was Audrey, not

Dora Lee, who had animosity towards Vicki and sought to keep Vicki from visiting Dora Lee.

[¶38.] Audrey argues that even if there was evidence of undue influence as to the will, the codicil removed any taint of undue influence. She relies on *In re Estate of Elliott*, 537 N.W.2d 660, 665 (S.D. 1995), stating that where "a subsequent codicil republishes the prior will, any taint in the earlier will from undue influence is removed if there is no evidence of undue influence at the time of the subsequent codicil." In Audrey's view, this statement reflects a rule that allows a party who unduly influenced a testator's disposition to purge the taint of the wrongful conduct in all instances by simply republishing the will without the wrongdoer's involvement. We do not read *Elliot* in such broad terms.

[¶39.] In *Elliott*, we affirmed the circuit court's determination that the plaintiffs had failed to establish either the presumption or existence of undue influence. 537 N.W.2d at 666. Our statement about republishing a will stated only that the taint can be removed, not that republication definitively removes all evidence of undue influence. *Id.* at 665. The inquiry ultimately remains a fact-driven analysis which we review under our deferential clear error standard. Where, as here, the factfinder determines that the evidence of undue influence is so pervasive that the taint is not removed, this statement from *Elliot* is unavailing. Though evidence was presented that Audrey was not directly involved in the making of Dora Lee's codicil, the unnatural disposition which benefitted her remained, and the court's finding of undue influence was not clearly erroneous. *See*

*Elliot*, 537 N.W.2d at 665 (observing the republished will omitted a provision which would have benefitted one of the parties accused of undue influence).

[¶40.] Audrey also claims that Dora Lee's access to independent counsel removed any taint of undue influence as a matter of law. She cites prior language from this Court that "the cloud of undue influence is removed on a showing that the grantor had independent advice that is neither incompetent nor perfunctory." *Walsh v. Shoulders*, 87 S.D. 270, 279, 206 N.W.2d 60, 65 (1973). However, this statement from *Walsh* was made in the context of considering whether there was evidence to rebut a presumption of undue influence. *Id.* We have already concluded that the involvement of competent counsel in this case rebutted the presumption of undue influence. Although the independent legal advice Dora Lee received concerning her estate plan was probative to the question of undue influence, it was not dispositive and did not nullify the circuit court's ability to weigh and draw inferences from all the evidence to determine whether the will and codicil were subject to undue influence.

[¶41.] "[T]estamentary capacity and undue influence are non-technical, fact-based inquiries that require a trial court to examine the parties' motives and states of mind." *Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d at 59. The circuit court entered findings on all four elements of undue influence and determined the evidence supported its conclusion that Dora Lee's last will and codicil were subject to undue influence. The court also found Audrey's testimony lacked credibility, and her denial of the claims of undue influence were confusing, evasive, and contradictory. There is substantial evidence to support all of the court's findings.

Therefore, the circuit court's determination of undue influence by Audrey was not clearly erroneous.

[¶42.] We affirm.

[¶43.] GILBERTSON, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.