#29569-aff in pt & rev in pt-PJD
**2022 S.D. 78**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE ESTATE OF
PAUL A. EICHSTADT

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON R. ERICKSON
Retired Judge

* * * *

ELIZABETH HERTZ of
Davenport, Evans, Hurwitz & Smith, LLP
Sioux Falls, South Dakota                    Attorneys for appellant Estate.


JEFF BURNS of
Churchill, Manolis, Freeman,
   Kludt & Burns, LLP
Huron, South Dakota                          Attorneys for appellee Kathryn
                                             Eichstadt.

* * * *

ARGUED
FEBRUARY 16, 2022
OPINION FILED **12/21/22**

#29569

DEVANEY, Justice

[¶1.] This appeal concerns whether a surviving wife voluntarily entered into a premarital agreement that waived any right she had to the property of her deceased husband and whether that premarital agreement is unconscionable. After a one-day court trial, the circuit court found that the wife did not voluntarily sign the premarital agreement and determined that the agreement is unconscionable. The Estate appeals. We affirm in part and reverse in part.

## Factual and Procedural Background

[¶2.] Paul Eichstadt, born in 1928, married Vanieda Schrimer in 1952. The couple had two children and owned and operated a farm and ranch near Wolsey, South Dakota. In 1987, Bret Bergeson accepted a job with Paul to work on the farm, and Bret, Bret's wife Kathryn, and their two children moved onto a farmstead owned by the Eichstadts. In 1988, Bret quit his position and left the farm. Kathryn and her children remained there, and she began helping Paul with the farm operation. She also performed limited bookkeeping services for Paul.

[¶3.] In 1989, while Kathryn was still living at the farm, Paul and Kathryn began an extramarital affair. In May 2001, Kathryn moved from the farm to Huron, where she obtained an apartment and a job. Kathryn's testimony implies that the affair ended at that time, but the record does not indicate why. However, Kathryn testified that after Vanieda, who was still married to Paul, passed away in July 2001, Paul started calling her and asking her to come to the farm because he was lonely and wanted her to clean his house and wash clothes. Soon thereafter, they began discussing marriage. In 2002, she agreed to marry Paul, although they

did not set a wedding date. Kathryn testified that she moved back to the farm in 2003 to live with Paul; however, she kept her job in Huron.

[¶4.] The events leading up to Kathryn's signing of the agreement at issue in this appeal began on the morning of July 17, 2003, when Paul asked Kathryn to go for a drive. Although Kathryn did not know where he planned to take her or the purpose of the outing, she testified that this type of request from him was not uncommon. Paul drove them to see his attorney, Carl Haberstick, in Huron. Once they arrived at Haberstick's office, Paul asked Kathryn to come inside with him, but he did not tell her why. According to Kathryn, it was not until they were inside the office that she learned Paul had hired Haberstick to draft a premarital agreement (Agreement). She further testified that although she and Paul had discussed marriage, they had never talked about having a premarital agreement and the meeting in Haberstick's office was the first time she saw the Agreement.

[¶5.] According to Haberstick, prior to the July 17 meeting, he had mailed two copies of the Agreement to Paul's residence for Kathryn and Paul to review. He testified that Paul had informed him, prior to coming to his office on July 17, that Kathryn did not intend to hire her own lawyer to review the Agreement. At the beginning of the meeting, Haberstick handed Kathryn a letter that stated:

> In talking with Paul today, he informs me that you do not wish to have an attorney review the Prenuptial Agreement before you sign it. Although I recommend you consult an attorney prior to signing, you may sign it without consultation.
>
> You must understand that I have drafted this Agreement at the request of Paul. He is my client and I cannot represent you in this matter. As such, I cannot give you any advice concerning the Agreement.

Haberstick testified that he "tried to make it clear that [he] represent[s] Paul, not her" and that he "cannot give her any advice or really answer any questions about the consequences of her signing it or not signing it." Kathryn signed the letter as acknowledgement of its receipt.

[¶6.]     The Agreement provides in relevant part:

> **4) Property Ownership.** All property and assets owned or acquired by either of the parties in his or her individual name or with a third party, whether before or after the marriage contemplated by this Agreement, . . . shall remain the separate property of the respective parties, except as otherwise provided in this Agreement.
> . . .
> **5) Joint Property.** If the parties acquire any property jointly during the marriage, the property shall be held by them as provided in the instrument conveying or evidencing title to the property.
> . . .
> **7) Disposition of Property Upon Death.**
>      a) Each party acknowledges that if the other dies, whether testate or intestate during the marriage, the share of the deceased party's estate to which the surviving party would be entitled to by law or to which a right could be asserted, except for this Agreement, could or might be greater than the share under this Agreement.
>
>      b) The estate of the deceased party may be disposed of by Will or Codicil thereto or Trust to such devisees or beneficiaries as the deceased party may determine in his or her sole discretion; or, in the absence of a Will, the estate of a deceased party shall descend to the heirs of that party as if the marriage had not taken place. In either event, *each party waives, and the deceased party's estate shall be free of, any claim or demand of inheritance, dower, curtesy, elective share, family allowance or any other claim given to a surviving spouse by law, irrespective of the marriage or any laws to the contrary.* If either of the parties has an existing will at the time of the marriage, that Will shall remain in effect, regardless of the marriage, until revoked by that party. Further, neither party intends by this Agreement to limit or restrict the right to give or receive a testamentary gift to

-3-

the other by Will without invalidating this paragraph and may thereafter change or eliminate the gift by a Codicil or a subsequent Will without in any way affecting the continued effectiveness of this Agreement.

. . .

**11) Homestead.** Each party releases any claim, demand, right or interest that may be acquired because of the marriage in any real property of the other party under the homestead provisions of the South Dakota Constitution or any South Dakota statute concerning the descent of the property as homestead.

. . .

**14) Voluntariness; Independent Counsel.** Both parties acknowledge that they have entered into this Agreement freely and voluntarily. *Kathryn further acknowledges that she has had sufficient opportunity to consult with an attorney but has chosen not to do so. Nonetheless, Kathryn is confident she understands what her rights and obligations would be in the absence of this Agreement.*

(Emphasis added.)

[¶7.] When questioned during trial about the language in section 14 of the Agreement, Haberstick explained that he added it to the Agreement shortly before Paul came to his office with Kathryn to sign it based on what he had learned from Paul. When asked if he recalled asking Kathryn whether she read the Agreement prior to coming to his office, Haberstick responded that he assumed she had read it because the Agreement states she did not want to have an attorney review it. He then added, "I didn't ask her have you specifically read this and understand it. But in the prenuptial agreement it says she understands it and she's read it." Haberstick acknowledged that he has no recollection of seeing her read the Agreement, and he agreed that "the vast majority of individuals" would not understand terms such as dower, curtesy, and elective share.

-4-

[¶8.]     When asked at trial about the estimate he gave in his deposition that the meeting in his office lasted approximately 10 to 15 minutes, Haberstick testified that it could have been "a little more, a little less" and commented that he was "just guessing." During this timeframe, Haberstick obtained information from Kathryn to complete her financial disclosure, and in addition to handing Kathryn the Agreement, Haberstick gave her a copy of Paul's financial disclosure to review. He did not explain the documents to her, but he did not limit the amount of time she could take to review them.

[¶9.]     Kathryn testified that during the meeting, Paul was pacing and she was crying. Haberstick did not recall Kathryn crying, but he conceded that he did not have any independent recollection of the events in question. He also testified that he could have been outside of the meeting room at some point because it is his practice to exit the room while the couple discusses the document and return to ask if there are any questions. However, when asked during cross-examination about Paul and Kathryn's demeanor, he explained that it is his practice to have persons who appear upset prior to signing come back another day rather than sign while upset, and had this occurred during the meeting with Paul and Kathryn, he would have told Kathryn to talk to a lawyer.

[¶10.]     Kathryn agreed that while they were at Haberstick's office, Paul offered to pay for a lawyer to look over the Agreement for her, but she declined. However, she explained that she declined because she trusted Paul and believed she did not need an attorney because Paul "always said he would take care of me."

[¶11.]    Ultimately, after skimming through the Agreement and Paul's disclosure, Kathryn signed the Agreement. Approximately a week later, on July 24, 2003, Paul and Kathryn were married in a private ceremony at her daughter's home in Wolsey. Kathryn testified that she did not know until that morning that their wedding would occur that day. She claimed that Paul said it was "too windy to hay" and then said, "Let's go get hitched."

[¶12.]    In June 2016, for reasons not disclosed in the record, Kathryn and Paul separated, and thereafter, Paul changed his will to remove previous bequests to Kathryn. It is unknown what bequests Paul had previously made to Kathryn because the prior will is not in the record. On September 16, 2016, Paul passed away, and his son, as personal representative of Paul's estate, filed an application for informal probate of Paul's will.

[¶13.]    On June 8, 2017, Kathryn petitioned the circuit court for her elective share, homestead allowance, exempt property, and family allowances pursuant to SDCL chapter 29A-2. The Estate filed a motion for summary judgment on Kathryn's petition, asserting that she had waived her right to any part of Paul's estate when she executed the Agreement on July 17, 2003. The Estate noted that both SDCL 25-2-18 and SDCL 29A-2-213 recognize the right of parties to enter into agreements waiving their inheritance rights as surviving spouses, including a right of election and homestead rights. Under SDCL 25-2-18(a)(3), "[p]arties to a premarital agreement may contract with respect to: . . . [t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event[.]" Similarly, SDCL 29A-2-213(a) provides that "[t]he right of

election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property, and family allowance, or any of them, may be waived, wholly or partially, before or after marriage, by a written contract, agreement, or waiver signed by the surviving spouse."

[¶14.]     The Estate further noted that such agreements are enforceable unless the surviving spouse proves that he or she did not execute the agreement voluntarily or that the agreement is unconscionable.  After identifying the relevant law, the Estate asserted that summary judgment would be proper because the undisputed material facts establish that Kathryn voluntarily executed the July 2003 Agreement given that she chose to sign it, declined the opportunity to hire a lawyer to review it, and otherwise presented no evidence to support that she was coerced into executing the Agreement.  The Estate further claimed that the Agreement is not unconscionable because Kathryn had adequate knowledge of the nature and extent of Paul's property through a disclosure attached to the Agreement.

[¶15.]     In response, Kathryn asserted that her execution of the Agreement was involuntary based on her limited education, her unequal bargaining position as compared to Paul's, her loyalty to Paul, and her fear of losing him.  She also asserted that Paul intended to undermine her ability to process the situation in Haberstick's office by not giving her the Agreement ahead of time, not telling her of his plan, and lying to Haberstick prior to the meeting about her not wanting an attorney.  She further claimed that Paul unduly influenced her by being the controlling person in their relationship, by using deception to get her to the

meeting, by being the one with all the financial means, and by being the one that made all of the decisions. Finally, she asserted that the terms of the Agreement are unconscionable because they fail to provide for her and because Paul's financial disclosure minimized his assets.

[¶16.] The circuit court denied the Estate's motion for summary judgment and held a one-day bench trial on February 3, 2021, during which Haberstick, Kathryn's daughter, and Kathryn testified. The Estate submitted the deposition testimony of Paul's accountant in lieu of his personal appearance at trial. At the conclusion of the trial, the court took the matter under advisement.

[¶17.] On February 5, 2021, the circuit court issued a memorandum decision, which was later incorporated in the court's findings of fact and conclusions of law issued on February 26. The court found that Kathryn did not voluntarily sign the Agreement. It further determined that the Agreement is unconscionable. The court therefore held that under SDCL 29A-2-213, the Agreement was not enforceable and ordered that it be set aside.

[¶18.] The Estate appeals, asserting multiple issues that are restated as follows:

> 1. Whether the circuit court improperly placed the burden of proof on the Estate.
>
> 2. Whether the circuit court clearly erred in finding that Kathryn did not voluntarily sign the Agreement.
>
> 3. Whether the circuit court erred in determining that the Agreement is unconscionable.

## Standard of Review

[¶19.] The circuit court's factual findings, including its finding that Kathryn did not voluntarily sign the premarital agreement, are reviewed under the clearly erroneous standard of review. *See In re Estate of Smid*, 2008 S.D. 82, ¶¶ 11, 23, 756 N.W.2d 1, 5–6, 9. "A finding of fact is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Action Mech., Inc. v. Deadwood Hist. Pres. Comm'n*, 2002 S.D. 121, ¶ 12, 652 N.W.2d 742, 748. "An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." *Smetana v. Smetana*, 2007 S.D. 5, ¶ 7, 726 N.W.2d 887, 891 (quoting SDCL 25-2-21(b)); *see also* SDCL 29A-2-213(c) (providing that "[a]n issue of unconscionability of a waiver is for decision by the court as a matter of law"). "We review question[s] of law under the de novo standard." *Smetana*, 2007 S.D. 5, ¶ 7, 726 N.W.2d at 891 (alteration in original) (quoting *Sanford v. Sanford*, 2005 S.D. 34, ¶ 12, 694 N.W.2d 283, 287).

## Analysis and Decision

### 1. Whether the circuit court improperly placed the burden of proof on the Estate.

[¶20.] In 1989, the Legislature adopted the Uniform Premarital Agreement Act (UPAA). *See* SDCL 25-2-16 to -25. In *Smetana*, the Court quoted language from a pre-UPAA case providing that "antenuptial agreements are favored in law since they allow parties to protect the inheritance rights of their respective children by prior marriages and thus prevent subsequent strife over the disposition of their respective estates." 2007 S.D. 5, ¶ 9, 726 N.W.2d at 891 (quoting *Schutterle v. Schutterle*, 260 N.W.2d 341, 347 (S.D. 1977), *superseded by statute on other grounds*

*as recognized in State v. Catch the Bear*, 352 N.W.2d 640, 645 (S.D. 1984)).

However, under our governing law, a party to a premarital agreement may claim it is unenforceable if either of two grounds are established: 1) a "party did not execute the agreement voluntarily;" or 2) "[t]he agreement was unconscionable[.]" SDCL 25-2-21(a)(1) and (2). Similarly, as in the case at hand, when one party to a premarital agreement is deceased, the surviving spouse may assert under SDCL 29A-2-213(b)(1) and (2) that a waiver of the right to an elective share of the deceased spouse's property is not enforceable because "[t]he waiver was not executed voluntarily" or because "[t]he waiver was unconscionable[.]"

[¶21.] It is undisputed that Kathryn, as the party seeking to avoid enforcement of the Agreement, has the burden of proof at trial. Both SDCL 29A-2-213(a) (providing that "[a] surviving spouse's waiver is not enforceable if the surviving spouse proves . . .") and SDCL 25-2-21(a) (providing that "[a] premarital agreement is not enforceable if the party against whom enforcement is sought proves . . .") impose the burden on the person seeking to invalidate a waiver or agreement to prove that such waiver or agreement was not executed voluntarily or is unconscionable. In fact, the circuit court noted in its memorandum decision and findings of fact and conclusions of law that Kathryn has the burden of proof.

[¶22.] Nevertheless, the Estate claims that "the manner in which [the court] conducted the trial shows that this was little more than lip service" because the court "required the Estate to present its case first" and then demanded "justifications for lines of questioning" by the Estate when it asked about matters "Kathryn had previously asserted or might assert." In response, Kathryn contends

the Estate waived its right to have this Court review this issue. At the beginning of trial, counsel for Kathryn asked the court "who would you like to go first[,]" and the court replied, "I think the Estate should go first." The Estate did not object or otherwise question the court's decision.

[¶23.] As this Court has often stated, "[w]e will not review a matter on appeal unless proper objection was made before the [circuit] court. Objections must be made to the [circuit] court to allow it to correct its mistakes." *Halbersma v. Halbersma*, 2009 S.D. 98, ¶ 29, 775 N.W.2d 210, 219–20 (alterations in original) (quoting *Rogen v. Monson*, 2000 S.D. 51, ¶ 15 n.2, 609 N.W.2d 456, 460 n.2). Because the Estate did not object or raise the issue it now identifies on appeal, the Estate failed to preserve for review its claim that the circuit court in effect improperly shifted the burden to the Estate by the manner in which it conducted the trial. It is important to note, however, that this is not a case in which the circuit court failed to apply the burden of proof to the proper party. It is apparent from the record that the parties and the court were, before and during the trial, operating under the same view that Kathryn had the burden of proof. Although the Estate was directed to proceed first with its witnesses, the Estate was allowed to examine the witnesses in response to Kathryn's counsel's questions, and at the conclusion of trial, Kathryn presented closing argument to the court first, asserting the reasons she had met her burden of proof that the Agreement is unenforceable.

### 2. *Whether the circuit court clearly erred in finding that Kathryn did not voluntarily sign the Agreement.*

[¶24.]       The Estate contends that the circuit court erred in finding that Kathryn did not voluntarily sign the Agreement because, in the Estate's view, "when the law is correctly applied to the facts of this case, the only possible result is the validation of the Agreement." In particular, the Estate contends that Kathryn's ignorance of the impact or meaning of the Agreement is insufficient to render her signature involuntary in light of the fact she did not claim or present evidence to support that she lacked the mental capacity to enter into the Agreement. The Estate further asserts that her lack of independent counsel would not invalidate her consent because she was aware Haberstick did not represent her and she declined Paul's offer to obtain an attorney for her. Finally, according to the Estate, because Kathryn's fear that Paul would end their relationship if she did not sign at that meeting was subjective and unprovoked, Kathryn could not establish that Paul coerced her or that her consent to the Agreement was the product of duress or undue influence.

[¶25.]       In response, Kathryn claims that the circuit court correctly found that "the circumstances surrounding the execution of the agreement led to her involuntarily signing the agreement." In particular, she notes that Paul was "a millionaire farmer" and she was a "woman with an 8th grade education who was in her 60s and had amassed $30,000 in assets of which $20,000 was a jointly owned car purchased by Paul Eichstadt." She further relies on the evidence that while the two had discussed marriage, they did not discuss a premarital agreement. She also

notes that Paul lied when he told Haberstick that she had indicated earlier that she did not want to hire her own attorney to review the Agreement. Focusing on the estimated duration of the meeting in Haberstick's office—10 to 15 minutes—Kathryn contends that she "had to process the betrayal or subterfuge by Paul, cover for a lie by Paul to his attorney, assess and maneuver through Paul's angst, evidenced by his pacing and tone, give her financial standing, determine what a premarital agreement was and what its ramifications are and then how it would affect her currently as well as possibly decades down the road and finally decide what the consequences would be if she didn't sign the agreement." In her view, considering her "limited education, [the] vast disparity in bargaining power and likely an undeserved sense of loyalty, protection and trust in her significant other[,]" it was no surprise "she chose the option that kept the person in the power role of their relationship happy, which in turn kept a roof over her head."

[¶26.] The term *voluntary* is not defined in SDCL 25-2-21, and this Court has not before examined the meaning of the term as it relates to premarital agreements. In regard to the term's use in SDCL 29A-2-213, the Court in *Smid*—a case involving trust documents in which the wife, post marriage, waived her statutory rights as a surviving spouse—also noted that the term *voluntary* as used in this statute is not defined. 2008 S.D. 82, ¶ 14, 756 N.W.2d at 7. While the Court in *Smid* did not identify a governing definition of *voluntary*, the Court noted the general rule applied to contracts that "one who accepts a contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party." *Id.* ¶ 17, 756 N.W.2d at 7

(quoting *Holzer v. Dakota Speedway, Inc.*, 2000 S.D. 65, ¶ 28, 610 N.W.2d 787, 795). The Court then declared that because there was no evidence that the wife "was *forced* to sign the waiver[,]" the circuit court did not err in finding her waiver to be voluntary. *Id.* (emphasis added).

[¶27.] On appeal, the Estate focuses particularly on this language from *Smid*. In its view, because Kathryn had the capacity to contract, it must be presumed that she knew the terms of the Agreement and assented to them. The Estate further contends that absent evidence of duress, fraud, undue influence, or mistake—the statutory grounds under which a contract is voidable—Kathryn cannot prove that she executed the Agreement involuntarily and thus the circuit court erred in invalidating the Agreement.[1]

[¶28.] The Estate's argument intermingles various defenses that may be raised under general contract principles with the governing statutory requirement of voluntariness at issue in this appeal. Under SDCL 53-4-1, "[a]n apparent consent is not real or free and is voidable when obtained through: (1) Duress; (2) Fraud; (3) Undue influence; or (4) Mistake." However, evidence of one of these statutory grounds governing contracts in general (typically contracts executed in arm's-length

---

1. Kathryn contends on appeal that there was undue influence. She asserted the same contention to the circuit court. However, she did not on appeal or before the circuit court identify the elements necessary to establish undue influence and the facts in the record that would establish each element. Moreover, the circuit court, in ruling in favor of Kathryn, did not address Kathryn's claim that undue influence exists or apply the law relating to undue influence. Because Kathryn did not assert that the evidence establishes the specific elements necessary for an undue influence claim and the circuit court did not rest its decision on a finding of undue influence, we examine only the grounds of involuntariness and unconscionability upon which the circuit court's ruling rests.

business relationships) is not *required* under SDCL 25-2-21 and SDCL 29A-2-213 for a party to prove that the contract or waiver is unenforceable. Instead, by enacting SDCL 25-2-21 and SDCL 29A-2-213, the Legislature determined that contracts or waivers executed in the context of marital or premarital relationships may be deemed unenforceable if a party's purported assent to the same was not voluntary. Thus, while a party could also assert one of the statutory grounds under SDCL 53-4-1 to invalidate a contract, premarital and postnuptial contracts are unique and require an examination of the totality of the circumstances surrounding the execution of the agreement.[2]

[¶29.] In fact, the Court's further analysis in *Smid* illustrates that a determination of voluntariness of a waiver under SDCL 29A-2-213 does not hinge solely on whether a party was "forced" to sign the agreement in question (a determination that actually aligns more closely with the general contract defense of duress). Rather, a determination of voluntariness involves a more comprehensive examination of the circumstances surrounding the execution of the agreement. *See Smid,* 2008 S.D. 82, ¶ 23, 756 N.W.2d at 9 (finding important to the analysis the trial court's findings pertaining to what the wife knew and understood and the events surrounding her signing of the waiver in question). After determining that the agreement in *Smid* was enforceable, the Court then separately examined the

---

2. Justice Kern's dissent does not consider the fact that these types of agreements do not involve arm's-length transactions. And Justice Salter's dissent applies the law relevant to the question whether a criminal defendant's plea was voluntary. Neither approach appropriately considers the unique nature of the relationship between parties to a premarital agreement.

surviving spouse's claim that her waiver was subject to rescission because it was obtained through fraud, undue influence, or mistake. *Id.* ¶¶ 29–37, 756 N.W.2d at 11–13.

[¶30.] Other courts have referred to the voluntariness inquiry as one examining the procedural fairness of the premarital agreement. *See Andrew B. v. Addie B.*, 494 P.3d 522, 529–30 (Alaska 2021) (procedural fairness looks at whether the agreement was freely entered into); *In re Marriage of Shanks*, 758 N.W.2d 506, 512 (Iowa 2008) (same); *In re Estate of Wolhar*, C.A. No. 12860–MG, 2018 WL 721417, at *4 (Del. Ch. February 6, 2018) (same); *In re Marriage of Bonds*, 5 P.3d 815, 826 (Cal. 2000) (same). Courts have also, in the context of premarital agreements, identified multiple considerations that bear on the question whether a person voluntarily executed a premarital agreement. Those include: "the coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power—in some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; and the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement." *Bonds*, 5 P.3d at 824–25; *accord Mamot v. Mamot*, 813 N.W.2d 440, 447 (Neb. 2012); *Wolhar*, 2018 WL 721417, at *4.

[¶31.] The majority of the Court in *Smid* declared, in response to the dissent's suggestion that specific factors similar to those quoted above should be applied to the question of voluntariness, that "our case law already has a standard for

determining whether a postnuptial agreement should be enforced." 2008 S.D. 82, ¶ 18, 756 N.W.2d at 8. Although the Court did not adopt the list of factors suggested by the dissent, a review of the Court's analysis in *Smid* reveals that the Court in fact considered some of these factors when determining whether the totality of the circumstances surrounding the execution of the agreement supported that it was executed voluntarily.[3] In particular, the *Smid* Court referred to the circuit court's findings on the role of counsel and the spouse's knowledge and understanding of the effect of the agreement. *See id.* ¶¶ 22–23, 756 N.W.2d at 8–9. In doing so, the Court recognized and applied the language from *In re Estate of Gab*, 364 N.W.2d 924, 925 (S.D. 1985) that "postnuptial agreements are subjected to close

---

3.     Contrary to Justice Kern's view in her dissent, the Court is not adopting a factor-based approach. Rather, just as the Court did in its further analysis in *Smid*, the analysis here looks to the totality of the circumstances surrounding the execution of the Agreement to determine whether the circuit court erred in finding that Kathryn did not voluntarily execute it. In defining the term "voluntary," Justice Salter relies on a singular quote from *Smid* regarding a lack of evidence that the spouse was "forced" to sign the waiver and a quote from our criminal cases stating what type of conduct would *not* support a finding of voluntariness. Notably, even when applying Justice Salter's suggested definition, it is clear from both *Smid* and the criminal opinions cited that the ultimate determination that an act is voluntary because it was a purposeful and intentional exercise of one's free will requires a consideration of a number of circumstances surrounding the act at issue. *See Piper v. Young*, 2019 S.D. 65, ¶¶ 35, 37, 936 N.W.2d 793, 807 (noting that a challenge to a guilty plea "prompts a close examination of all the circumstances that existed at the time of the plea to determine whether it was made voluntarily"; referring to factors including the awareness of the direct consequences of entering the plea and whether misrepresentations or improper promises were made); *State v Nikolaev*, 2000 S.D. 142, ¶ 10, 619 N.W.2d 244, 246 (looking to the totality of circumstances to determine the voluntariness of a plea); *State v. Two Hearts*, 2019 S.D. 17, ¶ 26, 925 N.W.2d 503, 513 (considering the totality of the circumstances in determining whether a defendant made "an unconstrained, autonomous decision to confess").

scrutiny because of the confidential relationship between husband and wife." *Smid*, 2008 S.D. 82, ¶ 22, 756 N.W.2d at 8.

[¶32.]    Here, consistent with this Court's past cases, the circuit court quoted language from prior decisions concerning the validity of such agreements and noted that the nature of the relationship between the contracting parties warrants giving the agreements close scrutiny. The circuit court thereafter examined the totality of the circumstances surrounding Kathryn's execution of the Agreement. In particular, the court found that Kathryn was unaware that Paul had hired Haberstick to draft the Agreement. She was also unaware, when Paul asked her to go for a car ride on July 17, 2003, that he intended to take her to Haberstick's office to execute the Agreement. The court considered important the fact that Kathryn, who had limited education, did not understand the legal terms in the Agreement and that the entire meeting at the attorney's office took only 15 minutes. The court also found that Paul was the controlling person in the relationship and made all of the decisions, including when they would get married. Although Paul told Kathryn, while at Haberstick's office, that he would pay for an attorney if she wanted to consult one, the court entered the following finding: "I believe her when she says she was fearful of how he might react if she delayed, tried to negotiate changes or refused to sign his Agreement."

[¶33.]    The court further noted that "Paul's attorney did not go through the Agreement with Kathryn explaining the pertinent provisions after she said she trusted Paul and did not need to consult with an attorney." The Estate, however, takes issue with this finding, asserting that the court in effect required Haberstick

to also represent Kathryn.  The Estate contends this would violate Rule 1.7 of the Rules of Professional Conduct, which prohibits attorneys from representing someone whose interests are directly averse to a client.  The Estate further contends that because Kathryn waived her right to obtain counsel, "the court erred in concluding that the Agreement was invalid because Kathryn did not receive something she had expressly disclaimed."

[¶34.]      We are not persuaded by the Estate's contentions.  The circuit court did not suggest that Haberstick should have acted as Kathryn's counsel when she opted not to hire her own attorney; it merely considered, in assessing whether Kathryn understood the import of the Agreement, whether the terms were explained to her.  In that regard, a lack of explanation by Haberstick (as opposed to a lack of advice) is relevant.  Moreover, contrary to the Estate's view, the court's invalidation of the Agreement did not hinge on the fact that Haberstick did not explain the relevant terms to Kathryn.  Rather, the court properly considered this fact along with all the circumstances surrounding the execution of the Agreement.

[¶35.]      Here, the circuit court noted in its memorandum opinion, which was incorporated in the court's findings and conclusions, several differences between what transpired in this case and the facts in *Smid*.  For example, the circuit court noted that, contrary to what transpired with Kathryn, the wife in *Smid* had participated throughout the entire process leading to the agreement waiving her statutory rights as a surviving spouse.  *See* 2008 S.D. 82, ¶ 7, 756 N.W.2d at 5.  As noted in *Smid*, the wife had attended a meeting with her husband and her brother (who represented that he had experience dealing with estate matters) and the

attorney drafting the agreement during which the property at issue and the husband's desired disposition for each of his assets were fully discussed. *See id.* ¶¶ 5–8, 756 N.W.2d at 4–5.

[¶36.]     Further, the circuit court found in *Smid* that the wife knew and understood her husband's intended wish that the marital home (the property the wife claimed she did not voluntarily waive her statutory rights to) go to his children, and that she could live there as long as she wished but would have to pay for the upkeep while living there. *Id.* ¶ 23, 756 N.W.2d at 9. Also, when rejecting the wife's argument that she did not know what her rights as a surviving spouse were and that those should have been explained to her, the Court in *Smid* relied on the fact that although the husband's attorney did not specifically explain what each right meant, the attorney "did go through the entire document in [the wife's] presence" and "she at least heard she had these rights and was giving up these rights." *Id.* ¶ 22 n.6, 756 N.W.2d at 9 n.6.

[¶37.]     As to the general principle that "one who accepts a contract is conclusively presumed to know its contents and to assent to them," *see Smid*, 2008 S.D. 82, ¶ 17, 756 N.W.2d at 7, it is important to note, as the circuit court did here, that this principle does not apply when there is wrongful conduct by another contracting party,[4] *see id. Accord Johnson v. Rapid City Softball Ass'n*, 514 N.W.2d

---

4.    While Justice Kern's dissent acknowledges that wrongful conduct by the other contracting party can render a signature involuntary, the dissent does not address all of the circumstances surrounding the execution of the Agreement. Rather, it focuses only on the circuit court's finding that Kathryn was fearful of how Paul would react if she delayed, tried to negotiate, or refused to sign the Agreement, and then dismisses this finding as having no

(continued . . .)

693, 697 (S.D. 1994) (remanding for trial plaintiff's negligence suit after applying the legal principle that consent to a release is not valid if the release instrument was misrepresented or there was fraudulent or overreaching conduct; evidence existed that the plaintiff was unaware she was signing release because plaintiff's softball coach told the players that they needed to sign a roster before they could play and did not explain the roster's release of liability). The circuit court's findings reflect the troubling manner in which Paul obtained Kathryn's consent to the Agreement. Knowing that she trusted him to take care of her, Paul kept the Agreement secret until the day of signing. He then misrepresented to his attorney that Kathryn had previously reviewed the Agreement and that she did not want to consult her own attorney. According to Kathryn's undisputed testimony, Paul then paced the floor as she skimmed, and ultimately signed, without the benefit of any explanation by Paul or his attorney, an agreement waiving multiple rights via legal language that she did not understand.

[¶38.] As the Court in *Smetana* explained, "[t]he validity of an antenuptial agreement is to be decided on the basis of the facts of each case." 2007 S.D. 5, ¶ 10, 726 N.W.2d at 892 (quoting *Ryken v. Ryken*, 461 N.W.2d 122, 125 (S.D. 1990)). More importantly, under the clearly erroneous standard of review, the question is

_____

(. . . continued)

> bearing on the analysis. Even if we accept the premise that conditioning marriage on the execution of a prenuptial agreement might not, *in and of itself*, be a reason to invalidate a signature, this circumstance must be reviewed in conjunction with the totality of the circumstances. In particular, it is necessary to consider other facts identified by the circuit court regarding Paul's deception and the manner in which he orchestrated the meeting during which Kathryn signed the Agreement, facts which distinguish this case from those upon which the dissent relies.

not whether on the evidence presented we would have made the same findings as the circuit court.[5] Rather, we can only find clear error when, "after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Estate of Gaaskjolen*, 2020 S.D. 17, ¶ 18, 941 N.W.2d 808, 813 (citation omitted).

[¶39.] From our review of the record, the circuit court's findings regarding Paul's conduct and other related circumstances are not clearly erroneous. Moreover, the circuit court, after hearing and observing Kathryn's testimony, found her version of the events to be credible. *See In re Ricard Family Tr.*, 2016 S.D. 64, ¶ 15, 886 N.W.2d 326, 330 ("We afford great deference to the circuit court's ability to judge the credibility of the witnesses and the weight to be given to their testimony."). Thus, we cannot say that we are left with a definite and firm conviction that the court erred when it found that Kathryn did not voluntarily sign the Agreement. As such, the Estate has not established clear error, and we affirm the circuit court's order declaring the Agreement void and unenforceable on this basis.

### 3. *Whether the circuit court erred in determining that the Agreement is unconscionable.*

[¶40.] Under SDCL 29A-2-213(b), "[a] surviving spouse's waiver is not enforceable if the surviving spouse proves that: . . .

---

5. Rather than examine the record to determine whether there is evidence to support the circuit court's finding that Kathryn did not execute the Agreement voluntarily, both dissents engage in factfinding and reweighing of the evidence and fail to afford deference to the circuit court's firsthand assessment of Kathryn's testimony.

(2) The waiver was unconscionable when it was executed *and*, before execution of the waiver, the surviving spouse:

      (i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the decedent;

      (ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the decedent beyond the disclosure provided; and

      (iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the decedent."

(Emphasis added.) Similarly, under SDCL 25-2-21(a)(2), "[a] premarital agreement is not enforceable if the party against whom enforcement is sought proves that: . . .

The agreement was unconscionable when it was executed *and*, before execution of the agreement, that party:

(i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party."

(Emphasis added.)

[¶41.] The Estate contends that in determining that the Agreement is unconscionable, the circuit court improperly relied on the fact that "Kathryn received no consideration." The Estate notes under SDCL 25-2-17, a premarital agreement is "enforceable without consideration." In response, Kathryn asserts that the circuit court did not invalidate the Agreement simply because she did not receive consideration. Rather, she claims that this one finding was part of the

overall scenario surrounding her signing of the Agreement and thus relevant to the court's review of the totality of the circumstances.

[¶42.]    The Estate is correct that consideration is not necessary to validate a premarital agreement. SDCL 25-2-17; *Sanford*, 2005 S.D. 34, ¶ 17, 694 N.W.2d at 288 ("Under South Dakota law, a premarital agreement must be in writing and signed by both parties, and is enforceable without consideration."). Nevertheless, the circuit court was tasked with determining whether the Agreement was unconscionable when it was executed. In that regard, the circuit court could consider, as part of its examination of the circumstances surrounding the execution of the Agreement, the actual terms of the Agreement, including that it made no provision for Kathryn regardless of how many years the couple would be married. For example, in *Schutterle*, the Court considered that "the provision made for Edna by the operation of the terms of the agreement was not so disproportionate to the value of Ralph's total property holdings as to vitiate the agreement." 260 N.W.2d at 349.

[¶43.]    However, the Estate further challenges the circuit court's determination that the Agreement is unconscionable because the property Paul sought to protect had been obtained long before his marriage to Kathryn and Kathryn offered no evidence that she contributed to the accumulation of any of Paul's assets. Alternatively, the Estate asserts that even if the Agreement is deemed unconscionable, it is valid because the court did not apply the relevant statutory language requiring additional findings with respect to the financial disclosures. The Estate asserts such requisite findings could not be made here

because the nature and extent of Paul's property was fairly disclosed to Kathryn prior to her signing the Agreement.

[¶44.]    The circuit court did not identify, in either its memorandum decision or its conclusions of law, on which facts it was relying in determining that the Agreement is unconscionable. The court also did not examine whether the nature and extent of Paul's property was fairly disclosed to Kathryn prior to her signing the Agreement. Rather, the court's conclusion of law simply states that "[t]he *agreement* executed on July 17, 2003 between Kathryn Bergeson and Paul Eichstadt *was unconscionable*" without explaining why.[6] (Emphasis added.)

[¶45.]    Even if we assume that the Agreement's terms are unconscionable, the circuit court did not determine that Kathryn lacked or could not have had adequate knowledge of the nature and extent of Paul's property prior to signing the Agreement. "[A]n antenuptial agreement will be held valid if the prospective spouse can be said to have had adequate knowledge of the nature and extent of the other party's property, either as a result of disclosure by the other party or through the independent knowledge, however acquired, of the prospective spouse, or if the prospective spouse has been adequately provided for by the agreement." *Ryken*, 461 N.W.2d at 125 (alteration in original) (citation omitted). In *Sanford*, we explained that "[i]t is sufficient for a spouse to provide, within the best of his or her abilities, a

---

6.    It would be particularly challenging to review whether the *terms* of the Agreement are unconscionable because the record does not contain evidence related to Kathryn's contributions to the marriage or the extent to which Paul's assets existing at the time of his death existed prior to his marriage to Kathryn. *See Smid*, 2008 S.D. 82, ¶ 25, 756 N.W.2d at 9–10. Evidence of what, if any, bequests to Kathryn that Paul's prior will contained may also be relevant, but the will is likewise not in the record.

list of assets and liabilities with approximate valuations. The listing must be sufficiently precise to give the other spouse a reasonable approximation of the magnitude of the other spouse's net worth." 2005 S.D. 34, ¶ 44, 694 N.W.2d at 295.

[¶46.]     Here, the record reveals that prior to the meeting at Haberstick's office, Paul had prepared, with the help of his accountant and Haberstick, a document itemizing Paul's assets and liabilities and listing their approximate valuations. At trial, the deposition testimony from Paul's accountant was offered. This testimony explained the calculations the accountant provided for Paul's financial disclosure statement and how certain discounts were made because assets were held in Paul's first wife's irrevocable trust. Also, Paul did not own any land. The land he farmed was owned by a limited liability company, and Paul's revocable trust held a 49% interest in the limited liability company, while Vanieda's irrevocable trust also held a 49% interest in the company, and Paul and Vanieda's children owned the remaining interest.

[¶47.]     Kathryn did not contend at trial, nor does she on appeal, that Paul omitted property from the list. *See id.* ¶ 45, 694 N.W.2d at 295 (noting that the wife did not identify any issue with the financial disclosure that would suggest it failed to provide her with a "reasonable approximation" of the husband's net worth). Rather, at trial, Kathryn attempted to discredit the valuation of Paul's assets based on a balance sheet Paul submitted to a bank in August 2002 for financing related to his farming operation.[7] But the circuit court did not find that Paul's financial

---

7. The Estate explained that the 2002 balance sheet showing a $2.2 million figure reflects the value of the farming operation, not Paul's financial worth.

(continued . . .)

disclosure was inaccurate or that the balance sheet more accurately reflected Paul's financial worth. In fact, despite the statutory directive that a determination of unconscionability must include findings regarding a party's knowledge of the relevant property and financial obligations, the circuit court did not make *any* findings regarding the financial disclosures.

[¶48.] Nevertheless, the issue of unconscionability is a matter of law, and from our review of the record, the undisputed evidence established that Kathryn was aware at the time she signed the Agreement that Paul's financial worth far exceeded hers. Because the circuit court did not determine (and nothing in the record would support a determination) that Paul failed to provide a fair and reasonable financial disclosure at the time Kathryn signed the Agreement or that she did not, or could not, have obtained adequate knowledge of Paul's property and financial obligations,[8] the circuit court erred in invalidating the agreement under the provisions in SDCL 29A-2-213(b) and SDCL 25-2-21(a)(2).

[¶49.] Affirmed in part and reversed in part.

[¶50.] JENSEN, Chief Justice, and MYREN, Justice, concur.

_____

(. . . continued)
    The Estate further notes that the balance sheet figures include the value of the land that is owned by the limited liability company, not Paul.

8.  Testimony and evidence was provided at trial establishing that Kathryn performed bookkeeping tasks for Paul over the years, which included entering income and expenses into ledgers and compiling summaries of such to provide to Paul's accountant who prepared his income tax returns. Although it is not clear from the record that Kathryn would have had knowledge of Paul's net worth from her bookkeeping services, she had general knowledge of the farming operation. The evidence would not have supported a finding, had the circuit court made one, that Kathryn was unable to seek out further information about Paul's assets.

[¶51.]        KERN, Justice, concurs in part and dissents in part.

[¶52.]        SALTER, Justice, concurs in part and dissents in part.

KERN, Justice (concurring in part and dissenting in part).

[¶53.]        I agree with the majority opinion's conclusions that the circuit court did not improperly place the burden of proof on the Estate and that the circuit court erred in determining that the Agreement is unconscionable. However, I write to express my view that the circuit court clearly erred in finding that Kathryn did not voluntarily sign the Agreement.

[¶54.]        Although the majority opinion discusses *Smid* in depth, it neglects the underlying basic principle at play in that case: "[t]o permit a party, when sued on a written contract, to admit that [s]he signed it . . . but did not read it or know its stipulations would absolutely destroy the value of all contracts." 2008 S.D. 82, ¶ 38, 756 N.W.2d at 13–14 (quoting *LPN Tr. v. Farrar Outdoor Advert., Inc.*, 1996 S.D. 97, ¶ 13, 552 N.W.2d 796, 799). The majority opinion concludes that the circuit court did not err in finding that Kathryn's signature was not voluntary. This conclusion is based on Kathryn's lack of knowledge about the Agreement before the meeting at Haberstick's office, not understanding the terms in the Agreement when she signed it, Paul being the controlling person in their relationship, and Kathryn having been fearful of what would happen to their relationship if she refused to sign the Agreement that day. However, all things considered, the Agreement is a written contract signed by Kathryn without inducement to sign arising from fraud, misrepresentation, or other wrongful acts by another contracting party. These facts alone should render Kathryn's signature voluntary in accordance with *Smid*.

[¶55.] Additionally, the majority in *Smid* expressly rejected the use of specific factors to evaluate whether parties voluntarily entered into a postnuptial agreement. *Id.* ¶ 18, 756 N.W.2d at 8. And as the majority opinion acknowledges, this Court "did not adopt the list of factors suggested by the dissent" in *Smid*. *Ante*, ¶ 31 (opinion of the Court). This Court has clearly rejected a factor-based approach to determine whether a party signed a contract voluntarily. Thus, the majority opinion's reliance on other states' laws regarding a factor-based voluntariness test is an implicit abrogation of the *Smid* rationale—a result which neither party to this appeal is requesting. Instead, this issue should be analyzed using a totality of the circumstances approach, as the parties have briefed and as the law requires, considering whether, under all the facts, Kathryn's signature was voluntary.

[¶56.] Turning to the individual circuit court findings upon which the majority opinion relies for its voluntariness determination, Kathryn's signature was voluntary considering the totality of the circumstances. First, accepting as true the circuit court's finding that Kathryn "was fearful of how [Paul] might react if she delayed, tried to negotiate changes or refused to sign his Agreement[,]" a spouse's conditioning of marriage on the execution of a premarital agreement is not wrongful. *See Sanford v. Sanford*, 2005 S.D. 34, ¶ 47, 694 N.W.2d 283, 295 (upholding as valid a portion of a premarital agreement and noting that there would have been no marriage had the wife not agreed to the protection of the husband's property). As one court explained, knowing that a spouse will "not go forward with a wedding without a prenuptial agreement" is not, standing alone, "a reason to invalidate the agreement." *Farris v. Farris*, 202 So. 3d 223, 234 (Miss. Ct. App.

2016); *see also In re Marriage of Shanks*, 758 N.W.2d 506, 512 (Iowa 2008) (an ultimatum is not wrongful or unlawful); *In re Marriage of Barnes*, 755 N.E.2d 522, 527 (Ill. Ct. App. 2001) ("Nothing was legally or morally wrong with either of them conditioning marriage upon the execution of a premarital agreement.").

[¶57.]     Second, although Kathryn did not fully understand the terms of the Agreement, in that she did not know what rights she was waiving or what an elective share meant, her lack of full knowledge of the facts and law is insufficient to establish that she signed the Agreement involuntarily.  The surviving spouse in *Smid* made the same argument, and this Court rejected it, quoting the general rule that "one who accepts a contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party."  *Smid*, 2008 S.D. 82, ¶ 17, 756 N.W.2d at 7 (quoting *Holzer v. Dakota Speedway, Inc.*, 2000 S.D. 65, ¶ 28, 610 N.W.2d 787, 795).

[¶58.]     Notably, although Kathryn did not understand the exact effect of the Agreement, she did understand that the purpose of the Agreement was for Paul to keep his property and for her to keep hers, and she knew Paul held assets far in excess of hers.  When Kathryn first started working for Paul in 1988, she began to familiarize herself with his financial status by providing limited bookkeeping services for him.  And after Vanieda's death, but before Kathryn and Paul were married, Kathryn again provided bookkeeping services for Paul.  In fact, Paul's bookkeeping ledger from 2001 to 2004 was written entirely in Kathryn's handwriting.  Yet, even with her detailed background knowledge of Paul's financial condition, Kathryn did not ask a single question during the meeting in Haberstick's

office before signing the Agreement. Furthermore, the circuit court did not determine that Kathryn lacked or could not have had adequate knowledge of the nature and extent of Paul's property prior to signing the Agreement.

[¶59.] Third, the circuit court found, and the record supports, that Kathryn was given time to review the Agreement with no time limits placed upon her, and Paul told her he would pay for an attorney for her if she wanted to consult one. While the circuit court relied on Kathryn's eighth-grade education as evidence of her lack of understanding, the court ignored the undisputed evidence that Kathryn obtained her GED in 2001. In her testimony at trial, and in her written submissions to the circuit court, Kathryn explained that she only skimmed the document before signing it even though she did not understand some of the terms in the Agreement. Such a decision, while unfortunate in hindsight, does not support a finding of involuntariness. *See Smid*, 2008 S.D. 82, ¶ 38, 756 N.W.2d at 13–14 (providing that ignorance of the contents of an agreement or a mistake because of a failure to understand the terms before signing are not sufficient to render the agreement involuntary); *see also Hafner v. Hafner*, 295 N.W.2d 567, 569–71 (Minn. 1980) (upholding a premarital agreement despite the fact that the wife was not told of her rights and had limited formal education).

[¶60.] Finally, even accepting that Paul was the controlling person in the couple's relationship, Kathryn's own testimony indisputably reflects that she did not depend on Paul for her livelihood. She twice ended her relationship with him and moved into her own apartment and obtained employment. There is no evidence in the record that Kathryn would have been unable to support herself had she not

signed the Agreement and had Paul ended their relationship as a result. Also of note, when Paul presented Kathryn with the Agreement, the two had not yet set a wedding date. Thus, Kathryn's signature cannot be said to have been motivated by avoiding the embarrassment that could result from having to cancel existing wedding plans.

[¶61.]    In *Sailer v. Sailer*, the North Dakota Supreme Court upheld a premarital agreement under circumstances somewhat similar to those at issue here. 764 N.W.2d 445 (N.D. 2009). In *Sailer*, the couple signed a premarital agreement approximately two weeks before their wedding, and when the husband filed for divorce approximately 13 years later, the wife argued that she did not voluntarily execute the premarital agreement. *Id.* at 449. She acknowledged that she had received a draft of the document a month before she signed the agreement and had "looked over it" but asserted that she did not hire independent counsel to review it because she could not afford counsel. *Id.* at 450. She testified that she signed the agreement because she wanted her husband to trust her. *Id.* at 451.

[¶62.]    In upholding the agreement, the North Dakota Supreme Court determined that, from the wife's testimony, she failed to meet her burden of proving that the agreement was not executed voluntarily. *Id.* at 453. In particular, the court referred to the wife's testimony that "she had the document and had the opportunity to examine its contents well in advance of its execution," and she was aware of the disparity in the parties' assets when she signed the agreement. *Id.* Because her desire to marry and have her husband's trust did not establish the

necessary "undue pressure to sign the document," the court concluded that, under the circumstances presented, she executed it voluntarily. *Id.*

[¶63.] Although Kathryn did not have a month to review the Agreement like the wife in *Sailer*, she admitted that Paul offered to pay for an attorney for her, and no time limit was placed on her review of the Agreement prior to signing. In light of Kathryn's undisputed testimony that she declined the offer to obtain her own counsel, chose only to skim the Agreement, and chose to sign the Agreement because she trusted Paul to take care of her and did not want him to end their relationship, the circuit court clearly erred in finding that Kathryn did not voluntarily sign the Agreement.

SALTER, Justice (concurring in part and dissenting in part).

[¶64.] I believe the circuit court erred in its legal determination that the premarital agreement here is unenforceable. The Court correctly notes that the circuit court failed to apply any legal standard en route to its unconscionability conclusion, and I join that part of the Court's opinion. However, the circuit court also failed to apply an accurate standard to test voluntariness—a fact the Court recognizes but does not correct. For this reason, I write separately to register my dissent and respectfully add my views.

[¶65.] Voluntary means that the act was taken intentionally and is a product of a person's free will. *See In re Estate of Smid*, 2008 S.D. 82, ¶ 17, 756 N.W.2d 1, 8 (affirming the circuit court's enforcement of a postnuptuial agreement noting "[t]here is no evidence that [the challenging spouse] was forced to sign the waiver; [the challenging spouse] admits as much."); *see also Piper v. Young*, 2019 S.D. 65,

¶ 36, 936 N.W.2d 793, 807 (in the context of plea agreements, a "voluntary [plea] . . . is by definition not the result of threats, force or promises made apart from the plea agreement, or any other form of coercion.") (alteration and omission in original) (quoting *State v. Nikolaev*, 2000 S.D. 142, ¶ 10, 619 N.W.2d 244, 247). Though the standard implicates the unique facts of each case, the ultimate factual inquiry must remain focused upon voluntariness and whether a person acted purposefully and intentionally to exercise her own free will.[9]

[¶66.] Here, the Court discusses, but does not settle on a controlling definition of voluntary. As a consequence, the Court confuses the circumstances Kathryn describes with sufficient evidence of involuntariness. At most, this testimony establishes that Kathryn perceived that Paul wanted her to sign the premarital agreement, but this is self-evident—Paul engaged Haberstick to draft the Agreement in the first place.

[¶67.] More specific to the voluntariness inquiry, however, Kathryn testified that she was not threatened or coerced, and though she said she was surprised, she never claimed that signing the Agreement was not her own decision. In truth, Kathryn's testimony establishes only that she signed the premarital agreement because she believed Paul wanted her to sign it. But without more, that does not

---

9. The Court's suggestion that considering the "totality of the circumstances" sufficiently illuminates the voluntariness inquiry conflates the scope of the information a court considers with what voluntariness should mean. But these are distinct concepts. *See State v. Two Hearts*, 2019 S.D. 17, ¶ 26, 925 N.W.2d 503, 513 ("The ultimate determination is whether, 'in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will . . . when interrogation tactics and statements are so manipulative or coercive as to deprive a defendant of the ability to make an unconstrained, autonomous decision to confess.'") (citation omitted).

make it involuntary even though Kathryn may regret that decision now, nearly twenty years later.

[¶68.] Viewing voluntariness as an essential exercise of Kathryn's free will, the unflattering evidence of Paul's personality, the lack of notice before signing the premarital agreement, no separate counsel, and Kathryn's level of education exist in this case as an amalgam of freestanding factors, not as a means of guiding a factfinder to the ultimate determination of voluntariness. Indeed, Kathryn prevails here because more of the factors favored her, not because she satisfied a definitive expression of voluntariness.

[¶69.] Beyond this case, the Court's decision may well impact the settled expectations of parties who have executed premarital agreements believing them to be binding. Under the Court's analysis, however, a surviving party can successfully challenge the agreement's enforceability simply with evidence that the deceased spouse exercised some degree of influence over the surviving spouse's decision to sign. But generally speaking, parties execute these agreements for good and important reasons and upon the faith that they will be enforceable and carry out their intent. By overlooking the essence of a voluntary act and consigning it to a tally of factors, I fear the Court's decision has adversely affected the state of the law.