#31017-a-JMK
**2026 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE
ESTATE OF MARTIN ALLEN WEBB,
Deceased.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
DEWEY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHELLE K. COMER
Judge

* * * *

JEFFERY D. COLLINS of
Lynn Jackson Shultz & Lebrun, P.C.
Rapid City, South Dakota

MEGHANN M. JOYCE of
Lynn Jackson Shultz & LeBrun, P.C.
Sioux Falls, South Dakota                    Attorneys for appellant
                                             Stephanie Webb.


ERIC JOHN NIES of
Nies, Karras & Skjoldal, P.C.
Spearfish, South Dakota                      Attorneys for appellee Dee
                                             Haugen.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 7, 2025
OPINION FILED **01/14/26**

KERN, Retired Justice

[¶1.]        Martin Allen Webb (Butch), age 57, and Stephanie Eagleberger, age 29, planned to marry in 2013 after dating for nearly a year. Butch was a successful businessman and rancher in South Dakota, and Stephanie co-owned and operated a high-end horse breeding business in Colorado. At Butch's request, his attorney, Eric Bogue (Eric), drafted a prenuptial agreement for his review. The proposed agreement, among other things, waived Stephanie's right to claim any share of Butch's estate after his death. Butch presented Stephanie with the agreement the day before their planned civil wedding ceremony, which was scheduled for the following evening at Eric's law office. The parties signed the agreement shortly before the ceremony began, and the two were married on October 11, 2013.

[¶2.]        Butch died approximately eight years later. Stephanie petitioned the court for an elective share of Butch's estate per SDCL 29A-2-201 and a family allowance under SDCL 29A-2-403, arguing that her signature on the prenuptial agreement was involuntarily made and that the agreement itself was unconscionable. After a trial on the matter, the court granted Stephanie's request for a family allowance but denied her petition for an elective share. The court found Stephanie voluntarily signed the agreement, and that the agreement was not unconscionable. Stephanie appeals. We affirm.

### Factual and Procedural History

[¶3.]        Butch Webb died on December 9, 2021, at the age of 65. At the time, he was married to Stephanie, who had been his wife since late 2013. Butch was nearly 30 years older than Stephanie at the time of their marriage, and this was a

second marriage for both parties. Throughout his life, Butch built a substantial career in the financial industry. Butch was college-educated with a bachelor's degree from the University of Wyoming. He was the past president of a bank and a very successful businessman, accumulating significant wealth through payday lending businesses. In addition to his business ventures, he operated a sizeable ranching operation near Isabel, South Dakota, where he raised cattle and valuable horses.

[¶4.] Stephanie lives in Loveland, Colorado. She graduated from high school in 2002 and has a bachelor's degree in equine science with minors in agricultural and racehorse economics from Colorado State University. While in college, Stephanie started working for Royal Vista Equine, a high-end horse breeding business. She began as an undergraduate intern and was later "hired on to help sales prep racehorse yearlings" around 2006. The company employed 10 to 12 employees and was headquartered in Fort Collins, Colorado. She eventually became the office manager in 2007 after graduating from college. Her duties included oversight of client billing, entering into contracts with clients, and working with CPAs to do the year-end taxes. She has been in charge of "the books since [she] started working in the office in 2006."

[¶5.] While working for Royal Vista in 2007, Stephanie married Chris Kepplinger, her first husband. They separated in 2011 and divorced in 2012. The divorce did not involve attorneys and was described as amicable. Also in 2011, the owners of Royal Vista decided to retire and turned the business over to Stephanie and her business partner, Jake Dahl. Through this process, Stephanie acquired a

45% interest in Royal Vista Equine. She testified that the reason the previous owners chose to turn the business over to her instead of selling it was because she was good at what she did. After acquisition, Stephanie and Jake changed Royal Vista's name to Vista Equine LLC. Her interest remained at 45%, and she continued in her role as office manager with a salary of $45,000 per year.

[¶6.] Stephanie and Butch's romantic relationship began in January 2013. Butch became a client of Vista Equine in 2007, but it was not until Stephanie began texting Butch about acquiring a brood mare in early 2013 that their friendship deepened. The two began texting and calling each other frequently, and their first date was February 11, 2013, where they met at a bull sale in Nebraska, and Butch asked Stephanie to join him for dinner.

[¶7.] Stephanie testified that the couple "had so many similarities" and "looked at things the same way." Their relationship "flowed" naturally despite the nearly 30-year age difference. Butch and Stephanie traveled to South Dakota for the first time together to visit Butch's ranch and to meet his children and other family members in the spring of 2013. Butch was previously married and had four children from his first marriage and from another relationship: Dee, Deb, and two minor children. Dee Haugen, the oldest of Butch's children, was 46 years of age at the time of trial.

[¶8.] After a few months of dating, Butch proposed to Stephanie on May 16, 2013. Because Stephanie was not ready to move to South Dakota, Butch purchased a property in Loveland, Colorado, for her on May 20, 2013, titling it solely in her name. The property covers nearly 70 acres and was valued at $1.3 million in 2013.

Stephanie contributed nothing to the purchase price of the property. At the time of purchase, Stephanie testified that Butch informed her he had multiple lawsuits pending against him in several states stemming from his payday loan businesses. It was Stephanie's understanding that the Colorado property was titled solely in her name in order to protect the property from a potential judgment arising from these lawsuits. Over the next few years, Stephanie testified that Butch continued to live in South Dakota but would visit Colorado one to two times per month, splitting his time between the two locations.

[¶9.] Stephanie testified that she was unsure of the date when Butch first brought up the idea of signing a prenuptial agreement, but that it was after he had purchased the Colorado property and likely in the late summer of 2013. She maintains that the first time Butch talked about the prenuptial agreement was in the context of the document being "designed to protect [her]." Dee, however, testified that Butch told her in May 2013 that he was engaged, and that Stephanie had agreed to sign a prenuptial agreement.

[¶10.] After their engagement, the couple almost immediately began discussing a date for their marriage. When deciding where they should marry, they ultimately agreed on a destination wedding in Italy, because it was Stephanie's dream to be married there. Stephanie began working with a travel agent, and they decided that they would be married in Sicily on November 12, 2013. They were unaware, however, of restrictions in Italy which required the filing of certain paperwork six months before the wedding, so they altered their plans. The couple decided to be legally married in Faith, South Dakota, in a civil ceremony before

traveling to Italy for their wedding. Neither Butch nor Stephanie wanted this civil ceremony in Faith to look or feel like their real wedding because they wanted to save that experience for their wedding in Italy in November.

[¶11.] The date of the civil ceremony was in flux, due primarily to Butch's busy fall schedule and the Atlas blizzard that began on October 3, 2013, which devasted farms and ranches across western South Dakota.[1] Eventually, the parties decided to marry on October 11, 2013, in Faith, at the law office of Eric and Cheryl Bogue, Butch's long-time friends and attorneys. The Bogues had helped Butch with various legal matters through the years, including lawsuits related to his payday lending businesses and the formation of LLCs. Stephanie recalled that Butch had a narrow window of availability during which the ceremony could be performed, and that "Butch had it pretty well planned and set up for us, thankfully. He arranged all of it. I mean, he knows the people; he knows the places."

[¶12.] The day before the wedding, on October 10, 2013, Butch began the drive from South Dakota to pick Stephanie up from her home in Loveland, Colorado, to bring her back to Faith. Around 3:30 pm that day, Bogue sent a draft of a prenuptial agreement to Butch. At 4:40 pm, Butch forwarded the email to Stephanie. Exhibit B attached to the agreement contained a list and valuations of the parties' assets, valuing Stephanie's property at $1.75 million and Butch's assets

---

1. Winter storm Atlas or the "Cattleman's Blizzard" lasted from October 3, 2013, through October 5, 2013, delivering inches of rain, up to five feet of snow, and high winds resulting in the death of tens of thousands of cattle, sheep, horses, and bison. National Weather Service, *October 3-5, 2013, Historic Blizzard*, https://www.weather.gov/unr/2013-10-03_05 (last visited Jan. 2, 2026).

at around $26 million.[2] Stephanie testified that this was the first time that she saw the prenuptial agreement.

[¶13.]     The agreement provided in relevant part:

> WHEREAS, Butch and Stephanie consider it [in] their best interests to settle between themselves, now and forever, their respective rights and all other rights which may grow out of their marriage relationship between them in which either of them now has or may hereafter claim to have in any property of every kind, nature and description, real, personal or mixed, now owned or which hereafter may be acquired by either of them now therefore,
>
> ***
>
> 8.  Except as herein provided, both Butch and Stephanie do hereby forever waive, release and quit claim to the other all of the property rights, and claims which he or she now has or may hereafter have as husband, wife, widower, widow, or otherwise by the marital relations which may exist in the future between the parties hereto[.]
>
> 9.  It is further agreed that this agreement shall not be construed or considered an agreement between the parties to obtain a divorce, one from the other, but that the same is to be considered strictly as an agreement settling rights respecting property division of each of the parties hereto, and that each person was urged to obtain legal advice [of] an attorney, and that the same is a free and voluntary act of each of the parties hereto.
>
> 10.  The parties have entered into this agreement freely and after adequate opportunity for independent counsel and acknowledge that the provisions are fair.  Neither party relies

---

2.     Exhibit B contained valuations of each of Butch's nine payday lending businesses amounting to around $16 million, and a valuation of Butch's 100% ownership in Webb Ranch, LLC and DeKaKe Ranch, LLC, amounting to around $9.8 million.

upon any representations or statements of the other as to any matters material to this agreement.[3]

[¶14.] At 8:20 pm, Stephanie replied to the email, in part: "Will you resend in English?? Lawyer jargon is the quickest way for me to feel completely inept. I really don't understand most of these points." After explaining her confusion, she addressed the asset valuation in the exhibits attached to the draft agreement. She corrected errors to her asset valuations and asked whether her 401(k) and personal savings accounts should be included. Stephanie testified that although she was confused about the legal wording in the document, she did not discuss the agreement with an attorney of her own choosing. She further testified that she was unsure whether she even read the entire agreement but acknowledged that she attempted to read the draft.

[¶15.] Late on October 10, 2013, or in the early hours of October 11, Butch arrived in Colorado and picked Stephanie up to bring her to South Dakota for their marriage ceremony. Stephanie testified that they did not discuss the prenuptial agreement on the drive to South Dakota. The parties stopped in Rapid City to buy clothing and in Sturgis to purchase a marriage license, after which they drove to the Bogues' office in Faith, arriving mid-afternoon.

[¶16.] When Stephanie and Butch arrived at the law office, Stephanie testified that she greeted the Bogues and then went to the restroom to change

---

3. Stephanie additionally claims that Paragraph 4 of the agreement, which begins, "That in the event of divorce or separation," contributed to her understanding that the agreement only covered property distribution in the event of divorce, not death. In the event of divorce, Paragraph 4 allowed Stephanie to claim 2% of Butch's estate for each year of marriage up to 20% of his estate.

clothes while Eric and Butch spoke in his office. She testified that when she came out of the restroom, Butch was walking out of Eric's office, and he asked Stephanie to join him in his office. Eric's recollection of the meeting was much different, however, in that he testified that he spoke to the parties together and that both Stephanie and Butch asked questions during the meeting.

[¶17.]    Stephanie does not recall whether they went through each paragraph of the agreement, but Eric testified that it was his normal practice to walk through prenuptial agreements paragraph by paragraph with the parties, especially those that related to post-death disposition of property as set forth in Paragraph 8. Eric also recalled at least one conference call with Stephanie and Butch in which they discussed the agreement before they arrived in the office. Eric testified that he did not provide legal advice to Stephanie, and that he would have strongly recommended that she consult with an attorney if she had any questions about the agreement. Eric stated it was his general practice to tell parties to the transaction that he could not represent them both because he could only represent the interests of one party. He would then encourage the other party to seek their own legal counsel, "which [he] would have done with Stephanie in this situation." The circuit court found credible Eric's testimony about the events of October 11, 2013.

[¶18.]    Stephanie testified she did not ask any questions during the meeting, and that the encounter lasted less than five minutes. She maintains she did not understand the agreement, but that she signed it regardless because she "was told that it was designed to protect [her] should something happen in [the payday lending lawsuits], and [she] trusted what [she] was being told and [she] trusted the

Bogues." She further testified that the premarital agreement was a "non-factor" in her decision to marry Butch. Eric testified that Stephanie was not in any distress and expressed "no reluctance" to him when she signed the prenuptial agreement. When asked whether she could have rescheduled the ceremony to give her more time to review the agreement to better understand it, she testified that she "[didn't] know that it could have been rescheduled very easily" because they had the ceremony "shoved in such a tight time frame" before the scheduled trip to Italy for their wedding nuptials in November.

[¶19.] After signing the agreement, the parties were legally married by Pastor Harold Delbridge, and the Bogues served as witnesses for the ceremony. The Bogues and Pastor Delbridge each testified that Stephanie generally appeared happy during the event. After the ceremony, Stephanie and Butch had dinner with the Bogues and then drove to Sturgis to stay the night. Butch drove Stephanie back to Colorado the next day, and then returned to South Dakota where he remained until the November wedding in Italy. A dozen family members and friends, including the Bogues, joined them in Sicily for the wedding.

[¶20.] In 2014, Butch and Stephanie had a daughter, followed by a son in 2019. Their relationship continued through the years, with Stephanie living at the Colorado property and Butch living in South Dakota on his ranch. Butch made an effort to spend half of his time in Colorado, and Stephanie visited South Dakota on multiple occasions. Stephanie testified that she visited the ranch in South Dakota four to six times before they were married, but that her visits were less frequent once their two children were born.

[¶21.]	Butch died on December 9, 2021.  Stephanie filed her petition for spousal elective share and family allowance under SDCL Chapter 29A-2 on May 31, 2022.  In her petition, Stephanie asserted the agreement signed on October 11, 2013, was unenforceable and that she was therefore entitled to an elective share of Butch's estate.  Dee Haugen, Butch's daughter from his first marriage, objected. The circuit court held a court trial on the petition on September 11, 2024, at the conclusion of which the court took the matter under advisement, leaving the record open for the submission of additional evidence.

[¶22.]	On October 25, 2024, Stephanie submitted for the court's consideration an affidavit with attached exhibits alleging Butch failed to disclose a personal retirement account and personal assets amounting to approximately $1.8 million. The circuit court issued a memorandum decision on December 30, 2024, and entered findings of fact and conclusions of law on February 3, 2025.  The court found that Stephanie voluntarily signed the agreement and that the agreement was not unconscionable.  In upholding the agreement, the court found Stephanie's waiver of the elective share valid.  Stephanie appeals, raising multiple issues which we rephrase as follows:

> 1.	Whether the circuit court erred in concluding that Stephanie voluntarily executed the prenuptial agreement.
>
> 2.	Whether the circuit court erred in concluding that the prenuptial agreement waiving Stephanie's spousal elective share was not unconscionable.

## Analysis

### 1. *Whether the circuit court erred in concluding that Stephanie voluntarily executed the prenuptial agreement.*

[¶23.] Stephanie first contends that the circuit court erred in finding that she voluntarily signed the prenuptial agreement which waived her right to claim a spousal elective share. In particular, she relies on the fact that she was first presented with the prenuptial agreement the day before the wedding, did not discuss the agreement with her own legal counsel, and signed the agreement just minutes before the civil ceremony. Additionally, Stephanie claims that their approaching November wedding in Italy and Butch's tight schedule left no option to reschedule the wedding, which further pressured her into signing the premarital agreement on the night of October 11.

[¶24.] The circuit court's factual findings, including its finding that Stephanie voluntarily signed the premarital agreement, are reviewed for clear error. *Estate of Eichstadt*, 2022 S.D. 78, ¶ 19, 983 N.W.2d 572, 580. Under the clearly erroneous standard, "[t]his Court must be left with a definite and firm conviction that a mistake has been made to overturn a circuit court's findings." *Dunham v. Sabers*, 2022 S.D. 65, ¶ 27, 981 N.W.2d 620, 633 (quoting *Roberts v. Roberts*, 2003 S.D. 75, ¶ 8, 666 N.W.2d 477, 480).

[¶25.] Under SDCL 29A-2-213(a), "[t]he right of election of a surviving spouse . . . may be waived, wholly or partially, before or after marriage, by a written contract, agreement, or waiver signed by the surviving spouse." "A surviving spouse's waiver is not enforceable if the surviving spouse proves that: . . . The

waiver was not executed voluntarily[.]" SDCL 29A-2-213(b)(1).[4] Similarly, under SDCL 25-2-21(a)(1), "[a] premarital agreement is not enforceable if the party against whom enforcement is sought proves that: . . . That party did not execute the agreement voluntarily[.]"

[¶26.] Ultimately, the court's duty is to determine whether the agreement was executed voluntarily, not whether one party later finds the terms unfavorable. The role of circuit courts in evaluating agreements between spouses is not to relieve a party of his or her bad bargain. *See Barton v. Barton*, 2012 S.D. 44, ¶ 14, 815 N.W.2d 553, 557; *Lodde v. Lodde*, 420 N.W.2d 20, 22 (S.D. 1988) ("But courts are not required to relieve parties from such bad bargains."); *Olson v. Olson*, 1996 S.D. 90, ¶ 11, 552 N.W.2d 396, 399. "Voluntary" is not defined in SDCL 29A-2-213 or 25-2-21, but we recently examined the meaning of the term as it relates to premarital agreements in *Estate of Eichstadt*, 2022 S.D. 78, ¶ 26, 983 N.W.2d at 582–83, and *Estate of Smid*, 2008 S.D. 82, ¶¶ 14–17, 756 N.W.2d 1, 7–8.

[¶27.] In *Estate of Smid*, we applied the general principle that "one who accepts a contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party." 2008 S.D. 82, ¶ 17, 756 N.W.2d at 7 (citation omitted). In

---

4. A statutory elective share operates to protect surviving spouses from unintentional disinheritance after being omitted from their deceased spouse's will. *See Estate of Simon*, 2024 S.D. 47, ¶¶ 40–42, 11 N.W.3d 36, 45–46 (Kern, J., dissenting). In South Dakota, elective shares range from a supplemental amount up to 50% of the augmented estate depending upon the length of the marriage. *See* SDCL 29A-2-202(a). Stephanie's share, after being married to Butch for eight years, would have amounted to 24% of Butch's augmented estate.

*Eichstadt*, while closely examining this Court's holding in *Estate of Smid*, we emphasized that rather than focusing on whether a party was "forced" to execute the premarital agreement, "a determination of voluntariness involves a more comprehensive examination of the circumstances surrounding the execution of the agreement." *Eichstadt*, 2022 S.D. 78, ¶ 29, 983 N.W.2d at 583 (quoting *Smid*, 2008 S.D. 82, ¶ 23, 756 N.W.2d at 9). "[P]remarital and postnuptial contracts are unique and require an examination of the totality of the circumstances surrounding the execution of the agreement." *Id.* ¶ 28.

[¶28.]     The factual scenarios presented in both *Eichstadt* and *Smid* are instructive here for purposes of comparison. In *Eichstadt*, wife was both unaware of the fact that husband had hired an attorney to draft the premarital agreement and that husband was taking her to sign the agreement on the day of execution. *Id.* ¶ 4, 983 N.W.2d at 577. Further, wife had a limited education, and she did not ask questions nor review the agreement with an attorney. *Id.* ¶¶ 8, 25, 983 N.W.2d at 578, 582. Wife testified that during the meeting, husband was pacing, and she was crying. *Id.* ¶ 9, 983 N.W.2d at 578. Upon her husband's death, wife petitioned the court for her elective share, arguing that her waiver of an elective share was involuntary. *Id.* ¶ 13, 983 N.W.2d at 579. The circuit court found wife did not voluntarily execute the agreement, rendering the agreement unenforceable. *Id.* ¶ 17, 983 N.W.2d at 580. Upon review of the totality of the circumstances, we determined the circuit court's finding was not clearly erroneous. *Id.* ¶ 39, 983 N.W.2d at 587.

[¶29.]     In *Smid*, husband and wife had been married for almost four years at the time of husband's death. 2008 S.D. 82, ¶¶ 3, 8, 756 N.W.2d at 4–5. This was husband's second marriage after his first wife—with whom he had four children— passed of cancer three years prior to his second marriage. *Id.* ¶ 2, 756 N.W.2d at 4. Wife petitioned the circuit court for her elective share, claiming she did not voluntarily waive her statutory rights in a prenuptial agreement that she signed only to "avoid probate." *Id.* ¶ 9, 756 N.W.2d at 5. At the hearing held on the petition, wife testified she did not receive an explanation of the prenuptial agreement before she signed it and that she lacked full knowledge of the facts and law relevant to the agreement. *Id.* ¶¶ 8, 13–14, 983 N.W.2d at 5–7. The circuit court found that any waiver was voluntary, and that the agreement was enforceable. *Id.* ¶ 17, 983 N.W.2d at 8. We affirmed the circuit court's holding, reasoning that wife was emotionally stable at the time, knew and understood husband's testamentary wishes, and was present and involved in the entire estate planning process. *Id.* ¶¶ 22–23, 756 N.W.2d at 9.

[¶30.]     Here, after examination of the totality of the circumstances, the circuit court found that Stephanie voluntarily signed the premarital agreement waiving her elective share. We review this finding for clear error. Stephanie concedes she was not deceived by Butch and did not feel tricked into signing the premarital agreement. The circuit court further found that she was not afraid of Butch or how he would react if she asked questions about the agreement, delayed, or would have refused to sign. Indeed, the circuit court found no evidence that Butch bullied her into signing the agreement or engaged in any form of wrongful conduct. Rather, the

evidence reflects, and the court found, that Butch did everything he could to please her, including purchasing a home and acreage for her, paying for the Italian wedding, and transporting her back and forth to South Dakota so she would not have to make the drive on her own.

[¶31.]     Stephanie received the agreement on the afternoon of October 10. Butch and Stephanie spent nearly eight hours in the car the day before the wedding and did not discuss the premarital agreement.  The circuit court found, "[d]espite knowing that Butch and Stephanie intended to execute the Prenuptial Agreement prior to the [legal] ceremony, Stephanie did not ask about the Prenuptial Agreement on the drive from Colorado to Faith."  Additionally, the circuit court found she had an opportunity to seek counsel, and the court found credible Eric's testimony that he would have encouraged her to seek independent counsel if she had indicated she did not understand the agreement.

[¶32.]     Yet, Stephanie testified that she felt pressured by the short window available to schedule their civil ceremony.  She contends that the wedding would have been very difficult to reschedule due to the short timeline between the civil ceremony and the Italian wedding in November, leaving her with no option to reschedule.  But this restraint was largely self-imposed.  The Bogues and Pastor Delbridge all testified that it would not have been an issue to reschedule the ceremony had Stephanie requested more time.  Stephanie and Butch had nearly a month before they left for Italy to reschedule if she did not feel comfortable signing the agreement that night.

[¶33.] Finally, the evidence established that Stephanie was an independent, capable person well able to make her own decisions at the time she signed the agreement. She was a college-educated business owner and general manager of a successful company, and she was not dependent on Butch for her income. The Bogues and Pastor Delbridge testified that the atmosphere the night of the civil ceremony was generally happy, and Stephanie denied feeling deceived or tricked into signing. This was not the case before the Court in *Eichstadt*, where the wife had an eighth-grade education and testified that her husband paced around the office while she cried and attempted to skim the agreement without the ability to consult with legal counsel. *See Eichstadt*, 2022 S.D. 78, ¶¶ 25, 37, 983 N.W.2d at 582, 586–87.

[¶34.] The circuit court found Eric's testimony regarding the facts and circumstances surrounding the execution of the agreement to be credible, and we afford great deference to a court's credibility determinations. *Estate of Gaaskjolen*, 2020 S.D. 17, ¶ 18, 941 N.W.2d 808, 813–14. Based on our review of the record, Stephanie has not established clear error, and we affirm the circuit court's finding that Stephanie voluntarily signed the premarital agreement waiving her elective share.

### 2. *Whether the circuit court erred in concluding that the prenuptial agreement waiving Stephanie's spousal elective share was not unconscionable.*

[¶35.] Stephanie next asserts that the agreement and waiver were unconscionable, primarily because she did not receive a fair and reasonable disclosure of Butch's financial condition when the agreement was presented to her.

She also contends that the language in the agreement did not adequately inform her that by signing, she would be waiving her spousal rights and any share of Butch's estate after his death. "An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." *Eichstadt*, 2022 S.D. 78, ¶ 19, 983 N.W.2d at 580 (quoting *Smetana v. Smetana*, 2007 S.D. 5, ¶ 7, 726 N.W.2d 887, 891); *see also* SDCL 29A-2-213(c) ("An issue of unconscionability of a waiver is for decision by the court as a matter of law."). Thus, we review a claim regarding the unconscionability of a premarital agreement de novo.

[¶36.] Under SDCL 29A-2-213(b):

> A surviving spouse's waiver is not enforceable if the surviving spouse proves that: . . . (2) The waiver was unconscionable when it was executed *and*, before execution of the waiver, the surviving spouse: (i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the decedent; (ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the decedent beyond the disclosure provided; and (iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the decedent.

(Emphasis added.)

[¶37.] Similarly, under SDCL 25-2-21(a)(2):

> A premarital agreement is not enforceable if the party against whom enforcement is sought proves that: . . . The agreement was unconscionable when it was executed *and*, before execution of the agreement, that party: (i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party; (ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and (iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

(Emphasis added.)

[¶38.] To succeed on her claim of unconscionability, Stephanie must first prove that the agreement was unconscionable when it was executed. In making this determination, the circuit court may consider "the circumstances surrounding the execution of the [a]greement, [and] the actual terms of the [a]greement." *Eichstadt*, 2022 S.D. 78, ¶ 42, 983 N.W.2d at 588. This includes whether the agreement makes provision for the other spouse or whether the terms of the agreement are disproportionate to the value of the drafting spouse's total property holdings. *Id.*

[¶39.] In *Smid*, where the marital home was the primary asset left over in husband's estate, we held the prenuptial agreement and elective share waiver were not unconscionable where there was no "evidence that [wife] contributed to the house during her marriage[.]" 2008 S.D. 82, ¶ 25, 756 N.W.2d at 9. In support of our determination, we cited *Wilkes v. Estate of Wilkes*, 27 P.3d 433, 437 (Mont. 2001), where the Montana Supreme Court affirmed "the trial court's finding that a prenuptial agreement was not unconscionable in part because the disputed residence was the home of his two children from a prior marriage and the new spouse contributed nothing to the assets the decedent obtained prior to the marriage." *Smid*, 2008 S.D. 82, ¶ 25, 757 N.W.2d at 10.

[¶40.] Here, the circuit court found that the prenuptial agreement was not unconscionable and that it "provided for Stephanie in the case of divorce." This finding was primarily based on provision 4 of the agreement, which reads in part:

> In addition [to retaining her sole separate property listed on Exhibit A], Stephanie shall be entitled to two percent (2%) of the

> value of Butch'[s] property for each year of their marriage. However, the total such value shall not exceed twenty percent (20%) of Butch's property regardless of the length of their marriage.

Exhibit A included both Stephanie's individual businesses in Colorado and the Colorado residence with all furniture, appliances, and personal effects. Butch's estate was valued at approximately $26 million, and 20% of his estate—the maximum amount Stephanie could receive under the prenuptial agreement—would have amounted to roughly $5.2 million. Based on the provisions in the agreement, the circuit court did not err in finding that, at the time it was executed, the agreement adequately provided for Stephanie in the event of divorce.

[¶41.]    As to Stephanie's spousal rights in the event of Butch's death, Stephanie argues that the premarital agreement is unconscionable because it does not contain language clearly waiving these rights. However, paragraph 8 of the agreement plainly states that both Stephanie and Butch "hereby forever waive, release and quit claim to the other all of the property rights, and claims which he or she now has or may hereafter have as husband, wife, *widower*, *widow*, or otherwise by the marital relations which may exist in the future[.]" (Emphasis added.) This provision further extends the parties' agreement to "their heirs, executors, administrators, and assigns for the purpose of enforcing any or either of the rights specified in an[d] relinquished under this paragraph." Importantly, the circuit court noted Eric Bogue's testimony that he reviewed each of the paragraphs in the agreement, including this one, with the parties, and as noted above, we defer to the court's credibility finding as to Eric's testimony.

[¶42.]     Moreover, the assets in Butch's estate at the time of his death—which were, in general, listed on Exhibit B of the prenuptial agreement—consisted predominantly of his payday lending LLC holdings and his ranching business. All these businesses were developed prior to Stephanie and Butch's marriage, and there is no indication in the record that Stephanie contributed substantially to Butch's businesses at the time the agreement was executed. As Stephanie conceded, she did not financially depend on Butch for her wellbeing prior to the marriage, and she maintained a successful career both before and during her marriage to Butch. And despite her waiver of the spousal rights she would otherwise have upon Butch's death, Stephanie retained the valuable property Butch purchased for her and titled solely in her name prior to their marriage. Given these circumstances, Stephanie has not proven the prenuptial agreement was unconscionable under SDCL 29A-2-213(b)(2) at the time of execution.

[¶43.]     Not only was the agreement not unconscionable, but Stephanie was also provided a fair and reasonable disclosure of Butch's property holdings prior to signing the prenuptial agreement.

> An antenuptial agreement will be held valid if the prospective spouse can be said to have had adequate knowledge of the nature and extent of the other party's property, either as a result of disclosure by the other party or through the independent knowledge, however acquired, of the prospective spouse, or if the prospective spouse has been adequately provided for by the agreement.

*Eichstadt*, 2022 S.D. 78, ¶ 45, 983 N.W.2d at 589 (citation modified). "It is sufficient for a spouse to provide, within the best of his or her abilities, a list of assets and liabilities with approximate valuations. The listing must be sufficiently precise to

give the other spouse a reasonable approximation of the magnitude of the other spouse's net worth." *Sanford v. Sanford*, 2005 S.D. 34, ¶ 44, 694 N.W.2d 283, 295.

[¶44.]      Here, Exhibit B of the prenuptial agreement contained an itemized valuation of Butch's assets, approximating his total estate at around $26 million. The easy-to-read list summarized his current property and holdings, including his nine payday lending businesses. Stephanie testified she had a "general understanding" of Butch's business holdings, but that he "was private with everybody" about these things, and that "[e]verybody was on a need-to-know basis." The list did not contain specific valuations of debt or liabilities, but it did contain a disclaimer at the bottom which read: "As of 2013, all net income values for [Butch's payday lending LLCs] will be dramatically impacted by numerous lawsuits filed against these various entities . . . which has resulted in a near total cessation of business activity." Considering Butch's financial circumstances and the specificity of the disclaimer, under the unique facts of this case, this statement was sufficient to put Stephanie on notice that the valuations of Butch's LLCs were subject to change. At the time of the agreement, Butch was also uncertain about how these lawsuits would impact the value of his estate. Considering the disclaimer, the lack of specific values for liabilities which were yet to be determined did not render Butch's estate valuation unreasonable or insufficient.

[¶45.]      With regard to Butch's ranching operation, Stephanie visited Butch's ranch and properties in South Dakota on multiple occasions. She testified in her deposition that she developed an understanding of the scope of Butch's operation during her visit in the spring of 2013. In fact, as noted above, Stephanie visited the

ranch four to six times during their ten-month courtship. Butch was also a client of her high-end horse breeding business, indicating he had sufficient assets to utilize such a facility.

[¶46.]        In support of her argument that Exhibit B was an unreasonable approximation of Butch's estate, Stephanie submitted an affidavit alleging Butch failed to disclose on Exhibit B a commercial building, real property, and a retirement account collectively valued at $1.8 million. The omitted property amounted to approximately 8% of the value of Butch's estate. The circuit court found that Exhibit B, even with the omitted assets, was a fair and reasonable financial disclosure of this approximate net worth. We agree. Stephanie presented no evidence that these assets were intentionally omitted from the property list, and $1.8 million in additional assets does not significantly impact the value of Butch's nearly $26 million estate.

[¶47.]        Butch provided Stephanie with a "reasonable approximation" of his assets in Exhibit B. Because Stephanie was provided a fair and reasonable disclosure of Butch's assets, we need not address the remaining factors under SDCL 29A-2-213(b)(2). Considering Stephanie's working knowledge of Butch's ranching operation and the list provided to her, Stephanie had sufficient information to make a reasonable assessment of Butch's assets. Accordingly, the agreement was not unconscionable at the time of execution.

## Conclusion

[¶48.]        We conclude the circuit court did not err in finding Stephanie voluntarily signed the premarital agreement waiving her elective share. Further,

the court committed no error in concluding that the agreement waiving Stephanie's elective share was not unconscionable. We affirm.

[¶49.]        JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, concur.

[¶50.]        SALTER, Justice, concurs in part and dissents in part.

[¶51.]        GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

SALTER, Justice (concurring in part and dissenting in part).

[¶52.]        I agree that we should affirm the circuit court's decision to enforce the Webbs' premarital agreement, but I believe the voluntariness inquiry should be guided by a rule explaining the definition of voluntariness, rather than a comparison to the results in *Smid* and *Eichstadt*. Here, as in *Eichstadt*, the majority opinion notes the absence of a rule for testing voluntariness in the context of premarital agreements, but it does not provide one. *Supra* ¶ 25. Instead, it simply begins an examination of the fact-bound circumstances of this case and obtains an outcome by noting similarities or differences with *Smid* and *Eichstadt*. *Id.* ¶¶ 26–28.

[¶53.]        As I noted in my *Eichstadt* dissent, we should state what I believe to be a clear and uncomplicated rule for voluntariness: "Voluntary means that the act was taken intentionally and is a product of a person's free will." 2022 S.D. 78, ¶ 65, 983 N.W.2d 572, 593 (Salter, J., dissenting). Doing so would provide a durable rule to guide courts and parties without relegating the voluntariness question to nothing more than a comparison of individual scenarios falling somewhere along an imprecise spectrum of results.